UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
CARLA WOODS and JEFFREY GOLDBERG,       :
as Stockholders' Representative and      :
Trustees of the Bionic Trust,            :
                                         :
                      Plaintiffs,    : 06 Civ. 5380 (AKH)(THK)
                                         :
                                         :
        -against-                    :
                                     : **REPORT AND**
                                     : **RECOMMENDATION**
BOSTON SCIENTIFIC CORPORATION,           :
                                         :
                      Defendant.     :
----------------------------------------X

**TO: HON. ALVIN K. HELLERSTEIN, United States District Judge.**
**From: THEODORE H. KATZ, United States Magistrate Judge.**

Plaintiffs Carla Woods and Jeffrey Goldberg, as Stockholders'
Representative and Trustees of the Bionics Trust, have moved for a
preliminary injunction pursuant to Rule 65 of the Federal Rules of
Civil Procedure.  Plaintiffs are seeking to enjoin Defendant Boston
Scientific Corporation ("Boston Scientific") from terminating and
replacing Alfred E. Mann and Jeffrey H. Greiner, the co-CEOs of
Advanced Bionics Corporation ("Bionics"), a medical device company
and wholly-owned subsidiary of Boston Scientific.  The motion was
referred to this Court for a Report and Recommendation.

Plaintiffs, who represent former Bionics stockholders who
received multi-billion dollar earn out rights as part of the
company's sale to Boston Scientific (hereinafter "Earn Out
Recipients"), allege that in moving to oust Mann and Greiner,
Boston Scientific is attempting to seize complete control over

Bionics in violation of several provisions in their merger agreement for joint decision-making and management. Plaintiffs allege claims for both express breach of contract and violations of the implied covenant of good faith and fair dealing. Plaintiffs argue that Defendant has no legitimate reason for seeking Mann and Greiner's removal and insist the dismissals are simply the first step in a management coup. They claim Defendant intends to replace Mann and Greiner with a new principal executive officer, selected unilaterally by Defendant and answerable directly to it, in breach of their agreement which, they argue, requires that Mann approve his successor, and that such successor be answerable only to an "Executive Board" made up of representatives of the Earn Out Recipients and Boston Scientific. In sum, Plaintiffs claim that Defendant's plans to remove and replace the current management principals and organizational structure will permanently strip them of their bargained-for right to joint control of Bionics, and put at risk future payments to the Earn Out Recipients.

Defendant argues that despite the joint control provisions in the merger agreement, it retains an absolute contractual right to remove the corporate officers of Bionics. Defendant proffers that in seeking the terminations of Mann and Greiner, it has acted in good faith and has attempted to comply with the processes mandated by the merger agreement. As to the appointment of a new chief executive, Defendant insists that it has not made its mind up about

2

a replacement and has attempted to abide by the merger agreement in selecting a successor, though it rejects the contention that Mann has any veto power over this process. Defendant also disputes that its actions will diminish the joint control rights that Plaintiffs claim. Defendant insists that a management change is necessary because, under Mann and Greiner's leadership, Bionics has been plagued by serious quality control problems and has incurred unacceptable financial losses. Defendant also maintains that Mann and Greiner's termination and replacement is required because Bionics has failed to conduct its business in accordance with a contractual duty to abide by Boston Scientific's corporate practices, policies and procedures.

This Court held an evidentiary hearing on Plaintiffs' application for a preliminary injunction on September 11, 12, and 13, 2006.[1] Mann and Greiner testified for Plaintiffs, and Boston Scientific's President and Chief Executive Officer, James R. Tobin, Executive Vice President for Finance and Administration and Chief Financial Officer, Lawrence C. Best, and Chief Operating Officer, Paul A. LaViolette testified for Defendant. The Court also received declarations from these individuals, as well as supporting exhibits.

---

[1] Subsequent to the hearing, the Court spent several weeks attempting to resolve the parties' differences by agreement. Those efforts proved to be unsuccessful.

**BACKGROUND**

I.   The Companies

Advanced Bionics, founded by Mann in 1993, is a medical device company specializing in implantable neurostimulation technologies. (See First Declaration of Alfred E. Mann in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, dated July 16, 2006 ("First Mann Decl."), ¶ 3.) The company currently develops, manufactures and distributes products on two platforms: cochlear devices that enable deaf people to hear, and neural electrical stimulation systems to treat chronic pain. Two other product categories are under development: implantable drug pumps for pain management, and a generalized neureostimulator called the BION, to treat a variety of neural conditions such as incontinence, headache, erectile dysfunction, and Parkinson's Disease. (See id.; Declaration of Jeffrey H. Greiner in Support of Plaintiffs' Motion for a Preliminary Injunction, dated Sept. 1, 2006 ("Greiner Decl."), ¶ 10.)

Boston Scientific is a medical products company that produces a number of well-known devices such as pacemakers, stent systems, and balloon angioplasty catheters. (See Declaration of Paul A. LaViolette, dated Sept. 6, 2006 ("LaViolette Decl."), ¶ 4.)  It is organized into five core business groups: interventional cardiology, cardiovascular, endosurgery, cardiac rhythm management, and neuromodulation.  The latter group is comprised of two units: auditory, which produces cochlear implants, and pain management,

which develops neurostimulation devices to treat chronic pain. (See id. ¶ 6.)  Boston Scientific, which is publicly owned and traded on the New York Stock Exchange, reports annual revenues of $8 billion. (See id. ¶ 5.)

II.  The Negotiation

In 2003, Bionics, "lack[ing] the sales force and capital necessary to exploit [its] new products," began investigating partnership opportunities with "larger, more established medical device companies that could provide . . . marketing muscle and capital . . . ." (First Mann Decl. ¶ 5.)  In January 2004, Mann approached Boston Scientific and another medical device company "about the possibility of a marketing partnership." (Supplemental Declaration of Alfred E. Mann in Support of Plaintiffs' Motion for a Preliminary Injunction, dated Sept. 1, 2006 ("Second Mann Decl."), ¶ 4.).  Soon, however, both companies manifested an interest in acquiring all of Bionics. (See id.) Mann and Best began discussing the potential sale of Bionics to Boston Scientific. (See First Mann Decl. ¶ 5; Declaration of Lawrence C. Best, dated Sept. 6, 2006 ("Best Decl."), ¶ 6).  As a part of these initial discussions, Mann presented Best with a business plan. (See Best Decl. ¶ 6; Advanced Bionics Updated 2004 Annual Operating Plan and Financial Projections: 2004-2009, dated Jan. 14, 2004 ("Bionics Plan"), attached as Exhibit ("Ex.") DX2 to Best Decl.)[2]  Over the

_____

[2] Best stated that two points from the Bionics Plan were of particular interest to him: the earning potential of Bionics (the

5

next two months, Mann and Best negotiated the terms of a potential merger.  Of particular concern to Mann was how Bionics would be managed post-merger. (<u>See</u> Second Mann Decl. ¶ 7.) During this period, Best presented to Mann three, successive "non-binding expression[s] of interest" that sought to address the concerns of both parties. (<u>See</u> Letter of Lawrence C. Best to Alfred E. Mann, dated Feb. 4, 2004, attached as Ex. 2 to Second Mann Decl.; Letter of Lawrence C. Best to Alfred E. Mann, dated Feb. 10, 2004, attached as Ex. 3 to Second Mann Decl.; Letter of Lawrence C. Best to Alfred E. Mann, dated Mar. 19, 2004, attached as Ex. 4 to Second Mann Decl.)

The parties ultimately came to terms and, on May 28, 2005, entered into an agreement whereby Bionics would merge into Boston Scientific as an indirect wholly-owned subsidiary. (<u>See</u> Agreement and Plan of Merger, dated May 28, 2004 ("Merger Agreement" or "Agreement"), attached as Ex. DX1 to Best Decl. and Ex. A to First Mann. Decl., § 2.03)  The merger became effective on June 1, 2004. (<u>See</u> <u>id.</u>) The Bionics Plan was explicitly referenced and attached to the Agreement. (Transcript of Preliminary Injunction Hearing ("H.") 11.)

---

plan projected multi-product revenue growth in excess of $600 million and pretax-profitability of nearly $200 million by 2009), and a projection that Bionics would not require any additional financing after 2005. (<u>See</u> Best Decl. ¶¶ 5-6.)

III. <u>The Agreement</u>

    A.   <u>The Earn Out</u>

     The terms of the merger included an upfront payment by Boston Scientific of $742 million to Bionics shareholders, and an opportunity to receive additional compensation through earn out payments based on Bionics' post-merger sales growth in four specifically enumerated Advanced Bionics products. (<u>See</u> Merger Agreement §§ 2.06, 2.08, 2.10; First Mann. Decl. ¶ 9; Best Decl. ¶ 13.) Bionics shareholders who chose not to sell all their holdings outright for cash became Earn Out Recipients,[3] eligible to receive payments based on sales of the two most advanced Bionics' products from 2005 to 2010, and for the two products still in development, from 2008 to 2013. (<u>See</u> First Mann Decl. ¶ 9; Best Decl. ¶ 13; H. 20.) The earn out payments are based on revenues, rather than profits (<u>see</u> Best Decl. ¶ 10, First Mann. Decl. ¶ 10.),[4] with the base earn out amount equal to three times the incremental sales growth for each product during the earn out period. Additional earn out payments become due if Bionics exceeds certain other sales

---

   [3] There are currently approximately 800 former Advanced Bionics shareholders and employee option holders who anticipate receiving payments through the earn out. (<u>See</u> First Mann. Decl. ¶ 12.) Mann is the single largest Earn Out Recipient. (<u>See</u> <u>id.</u>)

   [4] According to Best, he wanted the earn out to be based on revenue, rather than profit, because he "feared that a profitability-driven earn out would lead to an underinvestment in quality, research and development and result in missed opportunities." (<u>See</u> Best Decl. ¶ 10.) Mann contends he "offered to split the Earn Out between multiples of profits as well as sales," but was rebuffed by Best. (<u>See</u> First Mann Decl. ¶ 10.)

milestones. (See Best Decl. ¶ 13; First Mann. Decl. ¶ 9.) The entire earn out has been projected to be at least $3.2 billion. (See H. 21-22.)[5]

B.   Management and Control

The Merger Agreement contains several provisions outlining a system of joint control of Bionics. (See Merger Agreement § 5.04.) Plaintiffs contend that these controls were necessary to protect their earn out rights, which are primarily reliant upon Bionics' top line, or sales/revenue, performance. (See Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, filed July 17, 2006 ("Pl.'s Mem."), at 8.)

The Merger Agreement provides that the day-to-day management of Bionics "shall be conducted" by its officers, who currently include Mann and Greiner, "in accordance with the Bionics Plan." (See Merger Agreement § 5.04 (a).) Bionics' officers are, in turn, responsible to an "Executive Board," a six-person body comprised of three members designated by Boston Scientific and three members designated by the Earn Out Recipients. (See id. at ¶ 5.04 (b).)[6] The Executive Board is responsible for the "overall strategic

---

[5] Mann testified that Defendant has, to date, made all payments as required under the contract, to the amount of approximately $400 million. (See H. 22-23.)

[6] The Executive Board members presently are: Mann, Greiner, and David Morley, Bionics' Director of Operations, representing the Earn Out Recipients, and Best, LaViolette, and Fredericus Colen, a Boston Scientific Research and Development executive, representing Boston Scientific.

direction and operations" of Bionics. (Merger Agreement § 5.04 (d).)  Subject to certain other provisions, the Executive Board's broad responsibility regarding Bionics' business strategy and operations extends to, _inter alia_, considering modifications to forecasts in the Bionics plan, considering "incremental funding requirements of [Bionics]," and resolving "if possible" any "disagreements that may arise in connection with [the Merger Agreement]" (Id.)  The Agreement also provides that Bionics "shall at all times be subject to the corporate practices, policies and procedures of [Boston Scientific], including in respect of corporate governance (subject to the processes set forth [in this section] with respect to the selection or termination of any executive officer . . . of [Bionics]), internal financial controls, . . . regulatory and legal compliance, . . . [and] quality control . . . ."  (Id. at § 5.04(a); see also H. 13.)

Bionics and Boston Scientific each hold the authority to designate replacements for any vacancies in their three respective seats created by "resignation, incapacity or death." See ¶ 5.04 (b).  The Executive Board is empowered to act only upon a quorum of "at least four Members, two of whom have been designated by [Boston Scientific] and two of whom have been designated by [the Earn Out Recipients]." (Merger Agreement ¶ 5.04 (c).)  Any Executive Board decision must be unanimous among all the Board members present. (See id.)

In case of deadlock on the Executive Board, including on

certain matters of appointment and termination, the Merger Agreement provides for a multi-step dispute resolution process. (See Merger Agreement ¶ 5.04 (g)(I).) If the Board cannot reach agreement, the matter is first referred to Mann and Tobin (or their successors) for resolution.   If Mann and Tobin (or their successors) cannot agree, Tobin (or his successor) "shall decide the matter."  (See id.) If Mann (or his successor) disagrees with Tobin's decision, he or she may notify Boston Scientific of the disagreement, a move which triggers a fifteen-day negotiation period between Mann and Tobin (or their successors).  (See id.) If, after the fifteen days, no resolution is reached, Mann or his successor can refer the matter to a committee jointly selected by Mann and Tobin of "three independent business people experienced in medical device businesses . . . ."  The committee has thirty days to propose a nonbinding resolution. (See id.) If Tobin (or his successor) ultimately makes a decision over the objection of the Executive Board and Mann (or his successor as CEO), the Stockholders' Representative, on behalf of the Earn Out Recipients, may challenge the decision in a court proceeding. (See ¶ 5.04(g)(ii)(A).)  The Stockholders' Representative has the burden of establishing that the decision "based on the circumstances existing and reasonably foreseeable at the time of such decision and taking into account the reasonable business objectives of [Boston Scientific] and [Bionics], unreasonably adversely affected the ability of the Earn Out Recipients to realize the Earn Out

Payments, and . . . but for such decision, the Earn Out Payments would have been greater; . . . ." (Merger Agreement § 5.04(g) (ii)(A).)[7]

The Merger Agreement also states that "for the benefit of the Earn Out Recipients, without the approval of the Executive Board, neither [Boston Scientific] . . . nor [Bionics] shall, during the Earn Out Period" undertake a number of specific actions, including: (1) appointing any executive officer of Bionics, other than [the CEOs], or (2) terminating the employment of high-level executive officers of Bionics, or causing such officers to leave Bionics. (See Merger Agreement § 5.04(e)(iv), (v).)

Section 5.04(g)(iii) governs the selection of Bionics' chief executive and describes three succession scenarios for replacing Mann and/or Greiner as co-CEOs.[8] They are:

> (1) In the event that Mr. Mann or Mr. Greiner cease to be a co-chief executive officer of the Company, Mr. Mann and Mr. Tobin (or his successor as Chief Executive Officer) shall jointly agree on whether there should be a successor to such person as co-chief executive officer, and, if so, the identity of such successor.
>
> (2) In the absence or incapacity of Mr. Mann, Mr. Tobin

---

[7] This provision also contains the proviso that if "following such decision, Aggregate Net Sales and Gross Margin Percentage are consistent with the Bionics Plan for the applicable period (without considering any modifications to the Bionics Plan after the date of this Agreement), none of the Stockholders' Representative or any Earn Out Recipient will have any rights or remedies with respect to any such decision." (Id.)

[8] The three scenarios are not numbered in the Agreement, but are designated as (1), (2), and (3) for the sake of this discussion.

(or his successor as Chief Executive Officer) and, so long as he continues to be the chief executive or principal officer of the Company, Mr. Greiner, will jointly agree on the identity of the co-chief executive or principal officer of the Company.

(3) In the absence or incapacity of both Mr. Mann and Mr. Greiner, Mr. Tobin (or his successor as Chief Executive Officer) shall designate the chief executive or principal officer of the Company, following consultation with the Stockholders' Representative as to the identity and qualifications of such candidate; provided that if the Stockholders' Representative does not agree to the selection of such person as chief executive or principal officer, it may, at its option, refer such matter for resolution to the [three person committee described in the dispute resolution process].

(Merger Agreement § 5.04(g)(iii).)

IV.   <u>Events of July and August 2006</u>

On July 10, 2006, Tobin participated in a teleconference during which he authorized Best and LaViolette to try to convince Mann and Greiner to resign as co-CEOs and to consider the appointment of Lawrence Neumann as President of Bionics, and Peter Mariani as Group Chief Financial Officer. (<u>See</u> Declaration of James R. Tobin, dated Sept. _, 2006[9] ("Tobin Decl.") ¶ 14.)  Both Neumann and Mariani are Boston Scientific executives.  Both parties agree that the next day Best and LaViolette met with Mann; however, there is some dispute about the substance of the conversation.[10]  Mann

---

[9] Tobin's declaration is undated.

[10] According to Mann, Best first requested this meeting in mid-2006.  Mann suggests that he was "ambushed" at the meeting because it had "ostensibly been called for a different purpose" and because he was unaware that LaViolette would be attending. (<u>See</u> First Mann. Decl. ¶¶ 16-17.)

contends that Best "threatened to go to the Executive Board . . . to seek Mr. Greiner's and my termination if we didn't resign . . . ." (Second Mann Decl. ¶ 47.)  Mann states that Best "went through and then handed me" a "Talking Points" document that included several grounds for why Mann and Greiner should be terminated. (Id.)  This document (see Proposed Talking Points:  July 11 Larry Best/Paul LaViolette Meeting with Al Mann, dated July 10, 2006 ("Talking Points"), attached as Ex. B to First Mann Decl.), states that Boston Scientific plans to propose to the Executive Board that Mann and Greiner be terminated as chief executive officers and that "new senior executives be appointed as President and [Chief Financial Officer]." (Id. at 1.)

The memo goes on to list three reasons for the decision: 1) a dissatisfaction with "current management and management structure" at Bionics; 2) insufficient transparency at Bionics and "limited responsiveness to expectations of [Boston Scientific]" and decisions of the Executive Board;" 3) failure to perform "in line with financial expectations, particularly with respect to operating expenditures, cash utilization and auditory revenues." (Id.)  The document further states that "[w]hile we intend to follow the procedures outlined in the Merger Agreement for the termination and appointment of executive officers of [Bionics], we do not currently expect that we will change our view that the proposed terminations of your employment are in the best interests of [Boston Scientific], [Bionics] and their stakeholders, including the

13

earnout recipients." (Id. at 1-2).[11] Plaintiffs note that the issue of quality control was not included in the Talking Points, and Mann contends that "there was no mention at all of any such [quality] concern" at the meeting. (See Second Mann Decl. ¶ 48.)  LaViolette acknowledges that quality was not listed as a separate "talking point," but insists that it was discussed at the meeting. (See LaViolette Decl. ¶ 48, fn.4.)

On July 14, Best sent a letter to all Executive Board members officially placing the proposal to terminate Mann and Greiner, and to appoint Neumann and Mariani, on the July 18 agenda. (See Letter from Lawrence C. Best to Bionics Executive Board, dated July 14, 2006, attached as Ex. DX 54 to Tobin Decl.)

Plaintiffs filed the instant action and moved for a temporary restraining order and preliminary injunction on July 17.[12] On July 18, the Executive Board met to consider four resolutions presented by Boston Scientific, namely: 1) to terminate Mann and Greiner as

---

[11] Moreover, Mann testified that Best told him at the meeting that "the decision is final . . . [Tobin] will not consider any argument, arguments, period." (H. 88.)

[12] The Honorable Richard J. Holwell, U.S.D.J., sitting as the Part I emergency judge, denied Plaintiffs' motion for temporary injunctive relief and instructed the parties to participate in the dispute resolution process in their Merger Agreement.  On July 21, the parties appeared before the District Court (Wood, J.) (the case originally was assigned to the Hon. Kimba M. Wood, Chief Judge of the Southern District of New York) and stipulated that pending the decision of this Court on Plaintiffs' motion for a preliminary injunction, Boston Scientific would take no steps to terminate, replace or appoint any officer.

CEOs, 2) to choose Neumann as Bionics' president, 3) that Mariani be appointed CFO of Bionics, and 4) that no additional funding be provided by Boston Scientific to Bionics beyond the $36 million already approved by the Executive Board.  The Executive Board deadlocked on the first item, and unanimously approved the fourth. (See Second Mann Decl. ¶¶ 56-57.)  On the second and third items (Neumann's and Mariani's appointments), the Earn Out Recipients representatives insisted that those matters were not properly before the Board. (See id.)

On July 19, Mann and Tobin met by videoconference.  Tobin stated that he told Mann that his "mind was open [about the terminations] and would stay open until the contractual process ran its course." (Tobin Decl. ¶ 22.)  Tobin said he went on to outline three areas of concern:  a lack of transparency at Bionics, unacceptable financial performance, and insufficient quality control. (See id.)

In August, Tobin held a meeting with his senior management team to discuss the proposed management changes. (See Minutes of Aug. 3, 2006 Advanced Bionics Management Review, signed by Lawrence J. Knopf, attached as Ex. 21 to Second Mann Decl. and Ex. DX19 to Tobin Decl.; Tobin Decl. ¶¶ 24-25.)  Tobin reiterated his earlier reasons in a letter to Mann on August 4. (See Tobin Decl. ¶ 26; Second Mann Decl. ¶ 60; Letter from James R. Tobin to Alfred Mann, dated Aug. 4, 2006, attached as Ex. 23 to Second Mann Decl.) Within days, Mann requested an in-person meeting with Tobin to

discuss the terminations (see Second Mann Decl. ¶ 61; Tobin Decl. ¶ 26), and the two men met on August 24. Tobin stated that, "[i]n the end, we agreed to disagree and let the contractual process move to the next step." (Tobin Decl. ¶ 27.)

## DISCUSSION

The parties come before this Court for the resolution of what is best described as corporate marital discord. Here, however, the parties are not free to divorce, as they are bound together by the Merger Agreement at least until 2013. The Court has made it clear that a negotiated reconciliation is in the best interests of the parties, and has engaged them in "counseling" in order to bring them to some kind of detente. See Custer Channel Wing Corp. v. Frazer, 181 F. Supp. 197, 201 (S.D.N.Y. 1959) ("A court should, as far as practicable, refrain from interfering with the internal affairs and management of a corporation."). These attempts have failed, so the Court must now determine the merits of Plaintiffs' motion for a preliminary injunction.

I.   Entitlement to a Preliminary Injunction

A party seeking a preliminary injunction must demonstrate (1) the likelihood of irreparable harm in the absence of such an injunction, and (2) either likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. See 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406 (2d Cir.

16

2005) (citing <u>Fed. Express Corp. v. Fed. Espresso, Inc.</u>, 201 F.3d
168, 173 (2d Cir. 2000)).

Since the existence of irreparable harm depends upon
Plaintiffs' rights under the Merger Agreement, the Court will
invert the familiar preliminary injunction analysis, and will first
address whether Plaintiffs are likely to succeed in demonstrating
that Defendant's actions constitute express or implied breaches of
the Merger Agreement.  If answered in the affirmative, the Court
will then consider whether the breaches give rise to irreparable
harm justifying preliminary relief. <u>See</u> <u>Wisdom Import Sales Co.,</u>
<u>LLC v. Labatt Brewing Co. Ltd.</u>, 339 F.3d 101, 108 (2d Cir. 2003).

II.  <u>Likelihood of Success</u>

Plaintiffs allege express and implied breaches of contract by
Defendant.  They claim that appointment of a new chief executive
officer (even with the title of "President") without Mann's
approval, breaches Section 5.04(g)(iii) of the Merger Agreement,
and that if this new chief executive officer is not directly
answerable to the Executive Board, Defendant will be in express
breach of Sections 5.04(b) and (d).  (<u>See</u> Pl.'s Mem. at 20;
Complaint, filed July 17, 2006, ¶ 46.)  Plaintiffs further claim
that Defendant has violated its implied contractual obligation of
good faith and fair dealing by: (1) making a final determination to
fire Mann and Greiner before engaging, in good faith, in the
dispute resolution process, (2) engaging in covert planning to
replace Mann and Greiner with Neumann, and (3) offering only

17

"pretextual justifications" for its actions. (See id. at 21;
Supplemental Memorandum of Law in Support of Plaintiffs' Motion for
a Preliminary Injunction, filed Sept. 3, 2006 ("Pl.'s Supp. Mem."),
at 22-32.)

    A.   <u>Alleged Express Contractual Breaches</u>

         1. <u>The Parties' Positions</u>

     Section 5.04(g)(iii) of the Merger Agreement governs the
selection of Bionics' chief executive officer. As explained <u>supra</u>,
there are three contingencies outlined in the text. Plaintiffs
contend that the first sentence of Section 5.04(g)(iii) is
controlling in this case. It reads:

> In the event that Mr. Mann or Mr. Greiner cease to be a
> co-chief executive officer of the company, Mr. Mann and
> Mr. Tobin (or his successor as Chief Executive Officer)
> shall jointly agree on whether there should be a
> successor to such person as co-chief executive officer,
> and, if so, the identity of such successor.

Plaintiffs argue that this provision "unambiguously provides that
Mann and Tobin must jointly agree on the appointment of any
successor(s) to Mann or Greiner as Bionics' co-CEO" (Pl.'s Supp.
Mem. at 19), and that Mann is vested with an inalienable "veto" or
"approval" right over any successor(s) to himself or Greiner as CEO
(<u>see</u> First Mann Decl. ¶ 14; H. 91.) They further note that
throughout Section 5.04(g)(iii), in contrast to other executives,
Mann's name is never followed by a qualifier (such as "or his
successor"), which indicates that Mann holds this authority in his
personal capacity, whether or not he is currently employed as a co-

CEO of Bionics.   (See Pl.'s Supp. Mem. at 19; see also H. 123.)

Defendant argues that the first sentence of Section 5.04(g)(iii) applies to the limited situation of when Mann remains a co-CEO, but Greiner does not.   "In that instance, Mann has the right to consult with Tobin on who should be the new co-CEO."   (See Defendant Boston Scientific Corporation's Opposition to Plaintiffs' Motion for a Preliminary Injunction, filed Sept. 8, 2006 ("Def.'s Mem.") at 29.)   Defendant further argues that this interpretation is consistent with the "unusual management structure" of having co-CEOs, noting that "[i]f one of two co-CEOs is removed from office, it is perfectly logical for the remaining co-CEO to `have a role in selecting the partner with whom he will run the business."   (See id. at 31.) Since, in the instant situation, Defendant intends that neither Mann nor Greiner remains as a CEO, Defendant argues this sentence is not controlling.   Defendant also contends that to construe this provision as granting Mann a "veto" right over a successor would be inconsistent with other provisions in the contract that "make[] clear that . . . Tobin has the final say." (Id. at 32.)   Instead, Defendant urges, the controlling provision in this case is sentence three of Section 5.04(g)(iii).

> In the absence or incapacity of both Mr. Mann and Mr. Greiner, Mr. Tobin (or his successor as Chief Executive Officer) shall designate the chief executive or principal officer of the Company, following consultation with the Stockholders' Representative as to the identity and qualifications of such candidate; provided that if the Stockholders' representative does not agree to the selection of such person as chief executive or principal officer, if may, at its option, refer such matter for

> resolution to the [three person committee described in the dispute resolution process].

Defendant's argument rests on defining "absent" as including having been terminated. (<u>See</u> Def.'s Mem. at 30.)  Thus, Defendant's theory goes, if Mann and Greiner are "absent" via dismissal, Tobin is free to designate a new chief executive or principal officer following consultation with the Stockholders' Representative.  If the two sides cannot agree, the dispute resolution process in Section 5.04(g)(I) is triggered, with Tobin given the final call. (<u>See</u> <u>id.</u>)

Plaintiffs vociferously contest this interpretation, insisting that the drafting parties would not have used the word "absent" to mean "cease to be a co-CEO" when they used that very phrase just lines before.  (<u>See</u> Pl.'s Mem. at 20.)  Plaintiffs argue that if Section 5.04(g)(iii) allowed Defendant to unilaterally select Mann's successor, it would essentially eliminate the Earn Out Recipients' role in the management of Bionics, and render meaningless the dispute resolution procedure outlined in Section 5.04(g)(I), through which the adverse interests of Boston Scientific and the Earn Out Recipients are to be reconciled.  In other words, Plaintiffs pose the rhetorical question of why would there be a dispute resolution process <u>unless</u> the Earn Out Recipients "either through Mann, or Greiner, or the Stockholders' Representative" had a right to be involved in selecting the Bionics' chief executive. (<u>See</u> Pl.'s Supp. Mem. at 20.)

2. <u>Analysis</u>

The primary objective of contract interpretation is to give effect to the expressed intention of the parties. <u>See</u> <u>RLS Assocs., LLC v. United Bank of Kuwait PLC</u>, 380 F.3d 704, 710 (2d Cir. 2004); <u>Rothenberg v. Lincoln Farm Camp, Inc.</u>, 755 F.2d 1017, 1019 (2d Cir. 1985); <u>U.S. v. 0.35 Of An Acre Of Land</u>, 706 F. Supp. 1064, 1070 (S.D.N.Y. 1988); <u>Hartford Acc. & Indem. Co. v. Wesolowski</u>, 33 N.Y.2d 169, 171-72, 350 N.Y.S.2d 895, 898 (1973); 4 S. Williston, Williston on Contracts § 600 (3d ed. 1961).  In interpreting a contract, a court should consider these intentions as "objectively manifested by the language of the contract in light of the background against which the contract was written." <u>See</u> <u>RLS Assocs.</u>, 380 F.3d at 710.[13]

The Court begins with two general observations.  First, the contract contemplates that Mann and Greiner might someday be replaced as co-CEOs, including in the event of their termination(s).  This is clearly anticipated in Section 2.05 ("[t]he directors and officers as listed on Exhibit E shall . . . serve until their respective successors are duly elected or appointed and qualified or until their earlier death, resignation or removal").  Second, joint control is one of the bedrock principles of the Merger Agreement.  Boston Scientific is precluded

---

[13] The Agreement provides and the parties agree that the contract is governed by New York law. (<u>See</u> Merger Agreement § 8.09.)

from the day-to-day management of Bionics, but Bionics remains subject to Boston Scientific's policies and procedures. The officers of Bionics report to the Executive Board, and it is through the Executive Board that both Boston Scientific and the Earn Out Recipients have a voice in "the strategic direction and operation" of Bionics. (Merger Agreement § 5.04(d).) While Boston Scientific has the final say when the Executive Board is deadlocked and Boston Scientific has rejected the recommendation of the impartial mediation board, the Earn Out Recipients have, at the very least, negotiated a right to actively participate in the management of Bionics. Thus, the Court must consider Section 5.04(g)(iii) in light of the "background" of the Agreement's leitmotif of joint control.

Unfortunately, as clear as Section 5.04 is in conveying the underlying importance of joint control to the Merger Agreement, subsection (g)(iii) hardly presents a lucid roadmap for resolving the current impasse over successorship.[14] None of the three scenarios outlined in (g)(iii), on its face, speaks precisely to

---

[14] Mann testified that even if his interpretation of the first sentence of Section 5.04(g)(iii) is correct, the contract does not specifically address what would happen if Tobin and Mann could not agree on a successor. Mann testified that "this agreement does not speak to that issue," but that he was relying on Boston Scientific to "act in good faith. And I had no reason to expect that they would want to terminate either Mr. Greiner or myself." (See H. 94-95.) Mann went on to suggest that he interpreted the provision as essentially allowing a deadlock between Mann and Tobin on succession, that could be resolved only by the two of them working towards resolution. (See id.)

22

the situation at issue: where <u>both</u> CEOs have been terminated.

Nevertheless, while Section 5.04(g)(iii) does not explicitly and tidily address the instant question of who will determine succession at Bionics, its lack of exactitude on the issue does not necessarily render it ambiguous or incapable of interpretation. Contract ambiguity is not established simply because the parties disagree as to the meaning of a particular provision. <u>See</u> <u>0.35 Of An Acre Of Land</u>, 706 F. Supp. at 1070. Determination of whether a contract is ambiguous rests upon an analysis of whether terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade of business." <u>Hugo Boss Fashions, Inc. v. Federal Ins. Co.</u>, 252 F.3d 608, 617 (2d Cir. 2001) (quoting <u>Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.</u>, 818 F.2d 260, 263 (2d Cir. 1987)). Conversely, "[c]ontract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." <u>Id.</u> (quoting <u>Hunt Ltd. v. Lifschultz Fast Freight, Inc.</u>, 889 F.2d 1274, 1277 (2d Cir.1989)).

The Court takes notice of the unique verbiage of Section 5.04(g)(iii). Unlike other provisions of the contract, which use the infinitely more precise terms of "death, resignation or

removal" (see Merger Agreement §§ 2.05, 2.11(b), 5.04(b)), Section 5.04(g)(iii) refers to states of "absence" and "ceas[ing] to be a co-chief executive." Moreover, Section 5.04(g)(iii) is the only place in the contract where the term "absence" and the concept of "ceas[ing]" employment are used.

In considering the word "absence," Defendant directs the Court's attention to the dictionary, noting that "[i]n plain English, 'absence' is far broader than merely 'death.'" (See Def.'s Mem. at 30 (citing 1 Oxford English Dictionary 46 (2d Ed. 1989) ("absence" is "[t]he state of being absent or away (from any place"); Webster's Third New Int'l Dictionary 6 (2002) (the "state of being absent or missing from a place or from companionship: failure to be present"); Random House Dictionary 7 (2d Ed. 1987) ("state of being away or not being present").) Plaintiffs, meanwhile, contend that the meaning is far narrower, covering a situation where a party is either deceased or permanently inaccessible.[15]

Defendant's proffered dictionary definition of "absence" provides little assistance in construing the Merger Agreement, since the state of being away merely describes physical absence, not one's status while absent, i.e., absent as a CEO. Surely, a

---

[15] Mann testified that under 5.04(g)(iii), the term "absence" referred to his death or a situation such as being "on a desert island without a cell phone" or "kidnapped in Iraq." (See H. 92-93.) He insisted that "absence does not mean not CEO." (Id. at 93.)

CEO can be physically absent but remain the CEO.  The Court therefore must look to the entirety of Section 5.04(g)(iii) to understand the meaning of each sentence of that provision. Cf. RLS Assocs., 380 F.3d at 710 ("[A] court must read the relevant terms of a provision in full and in context, rather than simply assume that the selection of a particular word was intended to denote the significance lawyers normally intend by its use.").

There are a number of situations in which Section 5.04(g)(iii) might apply.  In order to necessitate a decision on a new CEO or co-CEO, it is presumed that one or both of the incumbents are either incapacitated, dead, permanently incommunicado, or have resigned or been terminated.   Therefore, 5.04(g)(iii) in its entirely is meant to apply to any one of these situations.

"Absence," then, in the last sentence of Section 5.04(g)(iii), where the CEO of Boston Scientific gets to select a successor, could perhaps mean as the result of death, incapacitation, termination, resignation, or having been rendered incommunicado. This broad reading is suggested by Defendant.  However, the three scenarios of Section 5.04(g)(iii) must be read in tandem.  The first sentence states that "[i]n the event Mr. Mann or Mr. Greiner cease to be a co-chief executive officer," Mann "shall jointly agree" with Tobin on successorship.  Mann holds this joint authority even if it is he who has "cease[d] to be" a co-CEO.[16]

_____

[16] The clear language of each sentence of Section 5.04(g)(iii) indicates that it is only Mann who retains

25

Defendant's contention — that the first sentence can only be understood to cover the situation where one co-CEO is replaced or resigns, because it makes sense for the remaining co-CEO to be involved in selecting the person with whom he will work — is belied by the fact that the unambiguous language of this sentence clearly allows Mann to be involved in choosing Greiner's co-CEO, even if Mann no longer remains as a CEO.  Moreover, if sentence one means what Defendant suggests, one wonders why it was not constructed like sentence two, which clearly provides for Greiner, "so long as he continues to be the chief executive or principal officer of [Bionics]," to jointly agree with Tobin on a co-CEO in Mann's "absence," rather then when Mann ceases to be a CEO.

Obviously, Mann could not exercise the authority to approve a co-CEO if he were dead, incapacitated or rendered incommunicado, thus leaving the situations of termination or resignation; that is, even if Mann resigns or is terminated, pursuant to sentence one, he along with Tobin (or his successor) has the right to choose his successor as Greiner's co-CEO.  Thus, "absence" cannot be equated with "ceasing to be" a CEO, since Mann would not be absent in the scenario addressed in sentence one, even though he may have ceased to be a co-CEO.  Moreover, why would the parties use "cease to be

---

successor-choice authority, whether or not he is serving as a co-CEO or the sole CEO.  Whenever Greiner or Tobin are referred to in this provision, the reference is qualified by "or his successor."  Mann retains authority in his personal capacity, even if he no longer is a CEO.

a CEO" in one sentence and "absent" in the next two sentences, and intend them to mean the same thing?

Looking further to the full text of Section 5.04(g)(iii), in contrast to sentence one, sentence two provides that if Mann is "absent or incapacitated" (not if he "ceased" to be a CEO), Tobin and Greiner, if he is still a CEO, must agree on a successor co-CEO.  There must be a distinction between ceasing to be a CEO and being absent, since the authority differs in each situation. In sentence one, even though he <u>ceases</u> to be a CEO, Mann retains joint authority with Tobin to select Greiner's co-CEO.  In sentence two, if Mann is <u>absent</u>, Greiner gets to participate in the selection of his co-CEO.

In sum, although both Plaintiffs and Defendants strongly disagree over the meaning of Section 5.04(g)(iii), and the word "absent" is ambiguous, when viewed in context, absence unambiguously does not mean no longer being CEO as the result of termination or resignation.  <u>See</u> <u>U.S. Trust Co. of New York v. Jenner</u>, 168 F.3d 630, 632 (2d Cir. 1999) (noting that "ambiguity is not created simply because the parties urge different interpretations").  "In a purely semantic sense, the [] Agreement is ambiguous . . . . [but] when a contract is capable of being interpreted one of two ways, courts must choose that meaning which gives effect to all the contract's clauses rather than one that renders part of the contract meaningless." <u>Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.</u> 992 F. Supp. 271, 276 (S.D.N.Y. 1997)

(citing <u>Newmont Mines Ltd. v. Hanover Ins. Co.</u> 784 F.2d 127, 135
(2d Cir. 1986)); <u>see also</u> <u>Sayers v. Rochester Tel. Corp.</u>
<u>Supplemental Mgmt. Pension Plan</u>, 7 F.3d 1091, 1095 (2d Cir. 1993);
Restatement (Second) of Contracts § 203(a).

The Court therefore concludes that Plaintiffs have established
a likelihood of success in their argument that Section 5.04(g)(iii)
unambiguously requires that, so long as he is available to do so,
Mann must, pursuant to sentence one, "jointly agree" with Tobin on
a successor CEO, as opposed to Defendant's argument that, pursuant
to sentence three, Tobin alone holds this authority in the event
that Mann and Greiner have been made "absent" through termination.
Put another way, since sentence three does not apply because Mann
and Greiner will not be "absent" if they are terminated, and
sentence two does not apply because Mann will not be "absent" if he
is terminated, it is sentence one that must control because it is
the only provision that addresses the condition of his ceasing to
be a CEO because of termination or resignation.  Thus, while the
language of sentence one appears to apply only when one CEO is
terminated, it only makes sense in the context of the entire
successorship provision if it applies to any termination of Mann
and Greiner, be it together or individually.

Even if the Court were to conclude that the Merger Agreement
is ambiguous on the issue of Mann's authority to appoint a
successor CEO of Bionics, thus permitting the consideration of
evidence external to the contract, <u>see</u> <u>Blue Planet Software, Inc.</u>

v. Games Int'l, LLC, 334 F. Supp. 2d 425, 433 (S.D.N.Y. 2004)
(citing Kerin v. United States Postal Serv., 116 F.3d 988, 992 n.2
(2d Cir. 1997)), such evidence provides further support for
Plaintiffs' position. There were letters of interest exchanged
between Boston Scientific and Bionics which outlined the terms
under which the parties would be prepared to agree to a merger.  A
letter dated February 10, 2004, which Boston Scientific sent to
Bionics, provided: "In the event of succession to either of the
current co-chief executive officers of Bionics, qualified
successors shall be identified by the Bionics members of the
[Executive Board] and approved by the entire [Executive Board] . .
. ." (Ex. 3 to Second Mann Decl.)  Mann testified that he rejected
this proposal because, among other things, he was not satisfied
with the provision for successorship.  (See Second Mann Decl. ¶
10.) The next and last draft of the letter of interest provided:
"In the event of succession to either of the current co-chief
executive officers of Bionics, qualified successors shall be
selected by Al Mann and Jim Tobin . . . ." (See Ex. 4 to Second
Mann Decl.)

     Finally, when one considers the overall thrust of the Merger
Agreement, which provides for the Earn Out Recipients ongoing
involvement in the management of Bionics, and various safeguards
for the protection of their interests, Defendant's interpretation
of the Merger Agreement would frustrate those purposes.  If Tobin
has the ultimate authority to terminate the Bionics CEOs, and the

29

ultimate authority to appoint a new successor, the Executive Board and mediation process, which would be the only remaining avenues for the Earn Out Recipients' voices to be heard, could become irrelevant.  As Plaintiffs point out, if Tobin's hand-picked CEO served at Tobin's pleasure, he or she would have little incentive to vigorously pursue strategies which were in the Earn Out Recipients' interest, over the objection of Tobin.  It would follow that if he or she was reluctant to escalate disputes with Tobin to the point where they had to be presented to an impartial mediation panel, the mechanisms in the Agreement for joint control of Bionics would be rendered meaningless.

Defendant has argued that it would be illogical to allow an employee who has been terminated to have a hand in selecting a successor.  (See Def.'s Mem. at 32.) The Court cannot disagree with that as a general proposition.  Nevertheless, "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." R/S Assocs. et al. v. New York Job Dev. Auth., 98 N.Y.2d 29, 33, 744 N.Y.S.2d 358, 360 (2002) (quoting Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 198, 738 N.Y.S.2d 658, 660 (2001)).  Moreover, Mann is not merely an employee of Bionics.  He is the Earn Out Recipient with the greatest number of shares in the Bionics Trust, and is the chosen voice of the Earn Out Recipients in the day-to-day management of the company.  While the Merger Agreement does not entitle him to perpetual employment by Bionics, it explicitly gives

him a right to participate in the selection of his successor.  The
Court "may not frustrate the intentions of the parties by altering
the contract's terms or by reading into the contract meanings not
contemplated by the parties." <u>Jakobson Shipyard, Inc. v. Aetna Cas.</u>
<u>and Sur. Co.</u>, 961 F.2d 387, 389 (2d Cir. 1992).

Thus, this Court determines that Plaintiffs are likely to
succeed on the merits of their claim that Boston Scientific cannot,
under Section 5.04(g)(iii), unilaterally appoint a successor to
Mann and Greiner.

B.   <u>Implied Contractual Obligations of Good Faith and Fair</u>
     <u>Dealing</u>

Plaintiffs' second claim is that Defendant's plan to terminate
Mann and Greiner's employment, and to unilaterally appoint a
successor, violates the implied duty of good faith and fair dealing
in their Merger Agreement.  (<u>See</u> Complaint, ¶¶ 52-53; Pl.'s Supp.
Mem. at 22.)  They argue that the planned terminations and
appointment are a "bad faith scheme to nullify the Merger
Agreement's joint control provisions and eliminate the drug pump.
. . ."  (Pl.'s Supp. Mem. at 22.) Defendant responds that, as a
parent company, it has the right and duty to terminate at-will CEOs
of a wholly-owned subsidiary when it believes it is in the best
interest of its shareholders. (Def.'s Mem. at 1, 28.) To suggest
otherwise, Defendant argues, "offends basic principles of corporate
governance as well as common sense." (Def.'s Mem. at 28.)
Defendant further argues that it has not derogated Plaintiffs'

authority to co-manage because the Executive Board will remain in place.  (See id. at 32.)

As discussed, both Mann and Greiner are at-will employees (see Merger Agreement § 2.05; H. at 82, 129-130), and even Plaintiffs concede that, after dispute resolution procedures have been exhausted, Tobin holds the ultimate power with respect to their termination. (See Second Mann Decl. ¶ 20.)  Plaintiffs contend that despite Defendant's appearance of working through the dispute resolution procedures, it is really a "sham process" because Defendant is not acting in good faith.  (See H. 84-85.) They contend that Defendant's bad faith is evidenced by: (1) making a final determination to fire Mann and Greiner before presenting the issue to the Executive Board and engaging, in good faith, in the dispute resolution process,(2) engaging in covert planning to replace Mann and Greiner with a Boston Scientific executive who had not even been interviewed by Mann or the Executive Board, and (3) offering only "pretextual justifications" for its actions. (See Pl.'s Supp. Mem. at 22.)

1. Legal Standard

Under New York law, a covenant of good faith and fair dealing is implied in all contracts. See Nat'l. Market Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004); 1-10 Industry Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631, 747 N.Y.S.2d 29, 31 (2d Dep't 2002). "This covenant embraces a pledge that neither party shall do anything which will have the

effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 135 (2002) (citations and internal quotation marks omitted); see also Chemical Bank v. Stahl, 272 A.D.2d 1, 14, 712 N.Y.S.2d 452, 462 (1st Dep't 2000).  This duty goes beyond the mere words of a contract to encompass "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." 511 West 232nd Owners Corp., 98 N.Y.2d at 153, 746 N.Y.S.2d at 131 (quoting Rowe v. Great Atl. and Pac. Tea Co., 46 N.Y.2d 62, 69, 412 N.Y.S.2d 827, 831 (1978).) Moreover, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979 (1995) (citation omitted). There are, of course, limitations to the doctrine of good faith and fair dealing.  It does not require that a contracting party must conduct itself in a manner that avoids offense to the other party. Moreover, a court is not empowered to read into an agreement obligations that are not apparent on its face. See Broder v. Cablevision Sys. Corp., 418 F.3d 187, 198-199 (2d Cir. 2005) ("[t]he implied covenant does not 'add[ ] to the contract a substantive provision not included by the parties'") (quoting Geren v. Quantum Chem. Corp., 832 F. Supp. 728, 732 (S.D.N.Y.1993)); see also Hartford Fire Ins. Co. v. Federated Dep't. Stores Inc., 723

33

F.Supp. 976, 991 (S.D.N.Y. 1989) (holding that "the implied covenant of good faith and fair dealing does not provide a court carte blanche to rewrite the parties' agreement . . . . Nor can a court imply a covenant to supply additional terms to which the parties did not bargain); Sterbenz v. Attina, 205 F. Supp. 2d 65, 70 (E.D.N.Y. 2002) (emphasizing that the written contract governs the relationship between contracting parties and that the court cannot impose obligations inconsistent with the contract; a party acting in compliance with rights expressly provided for in a contract cannot be held liable for breaching an implied covenant of good faith); see also National Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp., 25 A.D.3d 309, 310, 807 N.Y.S.2d 344, 346 (1st Dep't 2006) (holding that covenant "cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights").

2.   The Context

The issue of whether Defendant's actions to dismiss and to replace Mann and Greiner are, either in form or in substance, breaches of an implied duty of good faith, goes to the fundamental clash of interests created by the parties' Merger Agreement. Defendant is a public company, responsible to its shareholders.  It has a right, and indeed a responsibility, to demand of its employees and its subsidiaries full compliance with practices and procedures necessary to run its business for the benefit of its shareholders.  It is also true that, as a general rule under New

York law, the employment of an employee at will may be "freely terminated by either party at any time without cause or notice." See Horn v. N.Y. Times, 100 N.Y.2d 85, 91, 760 N.Y.S.2d 378, 380 (2003).  On the other hand, Plaintiffs and Defendant struck a bargain that grants Plaintiffs certain joint-control rights to be exercised for the benefit of the Earn Out Recipients, who have not yet been paid in full for the  sale of their rights in Bionics; these prerogatives necessarily diminish the authority Defendant would ordinarily enjoy as a parent company.  These rights are part of the consideration paid by Defendant for Bionics, and Defendant cannot now evade them.[17]

> a.   Plaintiffs' Allegation That Defendant Is Not Participating in the Dispute Resolution Process in Good Faith and Has Engaged in Covert Planning to Replace Mann and Greiner

Plaintiffs allege that Defendant has breached its implied obligations of good faith and fair dealing by engaging in a sham dispute resolution process, while simultaneously engaging in a covert plan to replace Mann and Greiner.

The starting point for analyzing the contention is Section 5.04(e)(v), which explicitly requires approval of the Executive Board, for the benefit of the Earn Out Recipients, for terminations of executives such as Mann and Greiner.  Indeed, the Executive Board is responsible for the overall operation and direction of

---

[17] Plaintiffs readily admit the tensions created by the arrangement, but contend that the system depends upon the good faith operation of the Executive Board. (See H. 157-60.)

Bionics.  There can be little question that, despite the ultimate authority residing with Tobin, Plaintiffs have joint management rights in termination decisions.

The evidence presented strongly suggests that Defendant "purposely" sought to prevent Plaintiffs from exercising these rights. See Carvel Corp. v. Diversified Mgmt. Group, Inc. 930 F.2d 228, 230 (2d Cir. 1991).  The evidence is clear that Defendant began considering the ouster of Mann and Greiner and the assumption of control over Bionics in March 2006.  In a March 2, 2006 e-mail, LaViolette stated that "Jim Tobin is going to hand [Bionics] over to me." (See E-mail of Paul LaViolette to Ed Northup, dated Mar. 2, 2006, attached as Ex. 41 to Declaration of Mark S. Germann in Support of Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, dated Sept. 3, 2006 ("Germann Decl.").) Just weeks later, Neumann was having discussions with Best about whether, "if there were a management change at Advanced Bionics, would I be interested in the management position at Advanced Bionics." (See Deposition of Lawrence R. Neumann, dated Aug. 29, 2006 ("Neumann Dep."), attached as Ex. 86 to Germann Decl., at 29:2-14.) The position of president of Bionics was officially offered by LaViolette to Neumann in May or June. (See H. 259.)  Indeed, LaViolette told the Court that discussions with Tobin for replacing Mann and Greiner took place as early as May and that replacements were considered at Tobin's express direction.  (See H. 259.) Defendants did not include Plaintiffs or

the Executive Board in any discussions regarding the proposed
terminations prior to July 2006, even though planning was well
under way months before.[18]

Defendant's contention that it had an open mind about
terminating Mann and Greiner in mid-July is clearly belied by the
evidence of furious planning in mid-June to assure that a change in
management was a fait accompli.  In one e-mail, LaViolette made
clear the plans in place for July 11 – the day that the plan was to
be revealed to Mann.

> We need to assume leadership first, which brings focus to
> the key issue of removing Jeff and Al from their Co-CEO
> roles.  We need a specific legal plan for this, including
> binding authority to run the company, to actually enforce
> a termination of their executive roles that sticks, and
> this has to be done swiftly.  We need to be clearly in
> position to assume operational oversight by [July 11] if
> possible.  Our goal here should be resignations with
> statements by [Greiner and Mann] that they cede [Bionics]
> to [Boston Scientific] and believe [Boston Scientific]
> will continue to work diligently on behalf of [Bionics]
> shareholders.  We want them out . . . with agreements to
> not disparage [Boston Scientific] going forward.

(E-mail of Paul LaViolette to Larry Neumann, dated June 13, 2006,
attached as Ex. 9 to Germann Decl.)  That Defendant sought to
ensure that its plans came as a complete surprise to Mann, Greiner,

_____

[18] Plaintiffs also presented evidence that Defendant had been
working with outside counsel by as early as May about "what the
contract required with respect to management change."  (See
Deposition of Lawrence J. Knopf, dated Sept. 1, 2006 ("Knopf
Dep."), attached as Ex. 84 to Germann Decl., at 50:21-52:04.)
Defendant also worked with outside counsel on drafting the
"Talking Points" presented to Mann and Greiner on July 11.  (See
id. at 57:12-60:13.)

and the Earn Out Recipients is evidenced by Tobin's "disinvit[ing]" Greiner to a meeting of his executive team, where reference was made to a "post leadership alignment" at Bionics. (See E-mail of Jim Tobin to Jeffrey Greiner, dated June 14, 2006, attached as Ex. 39 to Germann Decl.; June 28, 2006 EC Offsite Summary, attached as Ex. 14 to Germann Decl.)

Plaintiffs also presented strong evidence that Mann and Greiner's removal was a foregone conclusion, and that no amount of discussion was going to change Tobin's mind. Tobin met with Mann on July 19 and promised him that he would consider his concerns and discuss them with Boston Scientific executives. (See Tobin Decl. ¶ 24.) Defendant's outside trial counsel penned a letter, on behalf of Tobin, stating that Tobin had considered Mann's concerns, discussed them with Boston Scientific executives, and concluded that "a change in management is in the best interests of both Boston Scientific and Advanced Bionics." (See Knopf Dep. 106:24-108:22; Letter of James R. Tobin to Al Mann, dated Aug. 4, 2006, attached as Ex. 15 to Germann Decl.) However, the letter was drafted prior to Tobin's meeting with the Boston Scientific executives. (See Knopf Dep. 108:19-22.)

Defendants argue that they have abided by the dispute resolution process by bringing the issue of Mann and Greiner's proposed terminations to the Executive Board on July 18. (See Def.'s Mem. at 22.) The Board declined to vote on the issue, and Defendant argues that they have been urging Plaintiffs to agree to

the appointment of a three-person independent committee so that the mediation process can be exhausted. They chide Plaintiffs for coming to this Court for relief before exhausting the mediation procedures in the Merger Agreement. (See id. at 3, 21.)

Keeping in mind the quintessence of the duty of an implied duty of good faith and fair dealing, the Court notes that a breach of the duty requires evidence that one party has acted to destroy or injure the right of the other party to receive the benefit of the contract.  See Times Mirror Magazines, Inc. v. Field & Stream Licenses Co., 103 F. Supp.2d 711, 735 (S.D.N.Y. 2000).  In this case, the Court is persuaded that Defendant did not undertake in good faith its contractual obligation to address the issue of management of Bionics jointly with the Earn Out Recipients.

The Merger Agreement requires joint consultation on the matter of terminating Mann and Greiner, and the appointment of a successor.  The Court is persuaded that Defendant decided to remove Mann and Greiner as co-CEOs by as early as March, and no later than May, but it sought to keep Mann and Greiner, and indeed all the Earn Out Recipients, uninformed about its plans until just days before the July 18 Executive Board meeting.  When LaViolette and Best met with Mann and Greiner on July 11, they were not seeking to air problems they had with their leadership and to propose a means of resolving those problems.  They simply presented an ultimatum: resign or we will effect your termination.

Moreover, it was not just the process by which the removal was

39

engineered that evidenced bad faith.  The pre-selection of Neumann, a Boston Scientific executive, as the new president of Bionics, violated both express and implied provisions of the Agreement.  In effect, Boston Scientific has attempted to remove the representatives of the Earn Out Recipients from management, while acting to place its own executive in control of the company.  Yet, as everyone agrees, Boston Scientific is not permitted to manage and control the day-to-day operations of Bionics.  (See H. 266.) Defendant insists that its proposed changes would not affect the Executive Board's authority, arguing that its proposal "would not eliminate the Executive Board nor make [Bionic's] new President answerable only to Boston Scientific. . . . [T]he new President will still report to, and be responsible to, the Executive Board." (Def.'s Mem. at 32.)  However, LaViolette conceded that Neumann's offer letter stated that Neumann would report to LaViolette and made no specific mention of any reporting line to the Executive Board. (See H. 277-79.)  Moreover, deposition testimony of Neumann, who had been offered the position of president of Bionics, demonstrates that he was largely unaware of the role the Executive Board plays in managing Bionics.  (See Neumann Dep. at 59:06-19.)

The Agreement explicitly gives the Executive Board responsibility for the overall operation of Bionics.  (See Merger Agreement § 5.04(d).)  Moreover, "for the benefit of the Earn Out Recipients," without the approval of the Executive Board, during the Earn Out Period Boston Scientific is prohibited from

40

terminating any executive officer or causing such officer to have good reason to leave. (See id. at § 5.04(e)(v).)  Yet, at no time prior to the July 18 meeting did Boston Scientific voice at an Executive Board meeting its dissatisfaction with Mann and Greiner's overall management of the company, and the termination and succession decisions were made without any consultation with the Board.  The pro forma meeting with the Board on July 18 was not a good faith effort to address the issue.[19]

The Court does not take the position that Defendant is barred from internally assessing the management team at Bionics and determining that it wants change.  Neither Plaintiffs, nor indeed this Court, have the power to stop Defendant from forming an adverse opinion of its employees.  But that is not the issue.  In order to proceed in good faith under the unique management structure established in the Merger Agreement, which was negotiated in order to protect the interests of the Earn Out Recipients, prior to removing the co-CEOs, who were present at Bionics largely to protect the Earn Out Recipients' interests, in the Court's view,

---

[19]  The Court recognizes that Mann, Greiner, LaViolette, and Best essentially are the Executive Board, and that formally raising issues with Mann and Greiner at an Executive Board meeting may appear to elevate form over substance. This argument might have greater weight if there was evidence that Tobin, LaViolette, or Best ever discussed with Mann and Greiner, even on an informal basis, the seriousness of their concerns about their leadership of the company, and their desire to seek a new CEO. The only evidence in the record of their doing so was at the meeting on July 11, where Mann and Greiner were simply presented with the ultimatum to resign or they would be removed.

Boston Scientific has, at a minimum, an obligation to (1) present to the Executive Board, which has responsibility for managing Bionics, legitimate concerns which it wants addressed, (2) demonstrate or at least argue to the Executive Board how management has failed to address those concerns, and (3) engage the Executive Board in the process of management succession.  By surreptitiously planning Mann and Greiner's removal and essentially hiring its own handpicked replacement, Boston Scientific clearly did not engage the Executive Board in management succession.

> b. <u>Plaintiffs' Allegation That Defendant's Bad Faith is Evidenced By Its "Pretextual Justifications" for Firing Mann and Greiner</u>

Plaintiffs argue that Defendant's bad faith is further demonstrated because, in contravention of Steps 1 and 2 set forth above, Defendant never raised with the Executive Board serious concerns which management failed to address, but, instead, concocted after-the-fact "pretextual justifications" for removing Mann and Greiner as co-CEOs.  Defendant responds that it has good cause for a management change because Mann and Greiner have failed to adequately respond to its concerns over quality control and finances.  The Court heard hours of testimony and received hundreds of pages of documents relating to the purported quality control and financial issues at Bionics.  The critical facts adduced at the hearing, and from the parties' submissions, are summarized below.

Quality Issues at Bionics

The 2004 Cochlear Implant Recall

Months after the two companies merged, the Food and Drug Administration ("FDA") conducted a three-week audit of Bionics' facilities and identified twenty-three objectionable practices in connection with the production of its cochlear implants. (See FDA Form 483 Inspection, dated Sept. 15, 2004 ("September 2004 Form 483"), attached as Ex. DX20 to LaViolette Decl.; H. 45.) Within ten days, Bionics initiated a recall of its cochlear implants; it was unable to ship any more of the devices until November 8. (See Greiner Decl. ¶ 59.)

On February 1, 2005, the FDA took further action against Bionics's cochlear business, issuing it a Warning Letter and identifying eighteen "significant deviations" from federal regulations for "manufacturing, packing, storage or installation" of medical devices. (See FDA Warning Letter to Advanced Bionics, dated Feb. 1, 2005, attached as Ex. 23 to LaViolette Decl.) Such letters are issued by the FDA "[i]f the manufacturer does not react appropriately to the issuance of a Form 483, or, if there are many serious deficiencies noted on the form . . . ." (See Greiner Decl. ¶ 42.) A manufacturer who receives a Warning Letter either "must respond or face potential injunctive action against it." (Id.)

Within days of the February 1 Warning Letter, Jim R. Miller, the president of Bionics' auditory division, sent an e-mail to Greiner stating that "[p]roduct failures continue to occur at an

43

alarming rate. We are in significant danger of losing all our key accounts in NYC, i.e. NYU and Beth Israel because of failed devices." (See E-mail of Jim R. Miller to Jeffrey Greiner, dated Feb. 5, 2005, Ex. DXAA16.)[20]  The Warning Letter remained in place until it was lifted in early 2006. (See Greiner Decl. ¶ 43.)[21]

Post-Recall Inspections

Shortly after the FDA Warning Letter, Boston Scientific undertook an internal investigation of quality control at Bionics. The audit "discovered seven major non-conformities and many uncorrected issues remaining from the original Form-483 observations issued by the FDA." (See LaViolette Decl. ¶ 17; Boston Scientific Corporate Quality Audit Report, dated Feb. 16, 2005, attached as Ex. 24 to LaViolette Decl.)

In April and May, the FDA conducted a second inspection and issued Bionics another Form 483. (See FDA Form 483 Inspection, dated May 6, 2005 ("May 2005 Form 483"), attached as Ex. DX28 to LaViolette Decl.)  Just three observations were noted this time, all relevant to the company's spinal cord stimulator products. (See

---

[20] Greiner acknowledged that Miller had raised valid concerns, but could not definitively say that Miller was correct that Bionics was in danger of losing all of its New York accounts.  He also testified that the Executive Board had been briefed on the problems by Miller. (See H. 191-92.)

[21] On June 14, 2005, the FDA responded to Bionics' response to the February 1, 2005 Warning Letter.  The June 14 letter indicated that some of Bionics' responses were inadequate. (See Letter of Betty W. Collins to Jeffrey H. Greiner, dated June 14, 2006, Ex. DXAA17.)

id.)  Bionics viewed this as an indication of major improvements in its quality systems (see Greiner Decl. ¶ 64), and apparently, so did Boston Scientific.  Within days, both Tobin and LaViolette sent e-mails to Greiner congratulating Bionics on the audit. (See E-mail from Paul LaViolette to Jeff Greiner, dated May 6, 2005, attached as Ex. 33 to Greiner Decl.; E-mail from Jim Tobin to Jeff Greiner, dated May 7, 2005, attached as Ex. 34 to Greiner Decl.)

Boston Scientific's Corporate Warning Letter

On January 25, 2006 the FDA issued Boston Scientific a corporate-wide Warning Letter in response to Warning Letters issued to three Boston Scientific facilities, none of which was operated by Bionics.  (See FDA Corporate Warning Letter to James Tobin and Peter M. Nicholas, dated Jan. 25, 2006, Ex. AFT.)  This letter, only the third ever issued in the history of the FDA, places a heavy burden on Boston Scientific; all subsidiaries and divisions of the company are subject to the Warning Letter.[22] (See H. 303-05.)

The next month, Boston Scientific contracted an independent quality auditor, QualityHub, to do an onsite audit of Bionics "intended to verify the adequacy and completeness of Bionics' corrective actions related to the FDA-483s and the Warning Letter observations." (See LaViolette Decl. ¶ 19; H. 321.) The audit noted numerous deficiencies at Bionics. (See QualityHub Audit Report,

_____

[22] At trial, it was explained that, by stipulation of the two companies, Bionics and Boston Scientific have two different quality systems in place. (See H. 312-14.)

45

conducted Feb. 21-24, 2006 ("QualityHub Audit"), attached as Ex. 31 to LaViolette Decl.)  In early May 2006, Bionics issued a formal response to the audit report, noting that "[Bionics' management] agrees that its organizational structure does not sufficiently demonstrate that quality is the company's first priority."  (See Advanced Bionics Responses to QualityHub Audit, dated May 5, 2006, attached as Ex. DX34 to LaViolette Decl.)  Mann testified that as a result of the audit, Bionics undertook a corporate reorganization, making quality control directly reportable to Greiner.  (See H. 49.)

    The 2006 Cochlear Implant Recall

    In March 2006, Bionics issued a second recall of its cochlear implants. (See Greiner Decl. ¶ 30.)  Estimates are that the recall will result in a $10-15 million loss for 2006. (See id.)  Again, Miller sent an e-mail relaying concerns from customers about quality issues at Bionics.  (See E-mail from Jim R. Miller to Paul LaViolette, dated April 10, 2006, attached as Ex. DX43 to LaViolette Decl.)  Greiner attributed the recall to a "highly unusual problem" that was "very, very hard to detect." (See H. 206.)

    Bionic's Fiscal Performance

    Boston Scientific's Funding Commitment

    Under the Merger Agreement, Boston Scientific is committed to providing cash in an amount "reasonably sufficient" to meet the

46

reasonable cash flow needs of Bionics until December 31, 2006, but not in excess of $100 million, unless approved by the Executive Board. (See Merger Agreement § 5.05.)  According to Mann, the $100 million was understood to be a "replacement" for $100 million that Bionics had planned to raise through an initial public offering or other means, had it decided to remain an independent company (see H. 14); further, Mann viewed the $100 million committed by Boston Scientific as a floor, rather than a ceiling (see H. 18-19).  Mann testified that Bionics had, in fact, received more than double the $100 million mentioned in the Agreement, but that all increased expenditures were "fully approved and, in fact, often times directed by Boston Scientific." (See id. at 15, 18.)  He further explained that an unexpected, yet "significant financial impact" on Bionics was the 2004 cochlear implant recall (see id. at 30), but insisted that "much of those losses were investments in approved budgets by Boston Scientific . . . ." (id. at 37).

Plaintiffs and Defendant dispute the severity and importance of Bionics' increased funding needs in 2004 and 2005,[23] and whether

_____

[23] Under the Bionics Plan, which was dated 2004, losses were projected to be $39 million for 2004, and $30 million for 2005. (See H. 27.)  Mann testified that $71 million was lost in 2005, but that the bulk of this was attributable to the recall and additional programs either approved by Boston Scientific, or changes "made necessary" by Boston Scientific.  (See H. 29.)

Plaintiffs also contend that Defendant has presented a distorted picture of the import of the Bionics Plan.  For example, they say the Plan anticipated a joint venture relationship, which would have yielded an additional $17 million in revenues from marketing partnerships with other companies.

Defendant expressed dissatisfaction over how Bionics was spending its money.  Both sides agreed, however, that things reached a head in Fall 2005 when Bionics presented its 2006 budget, which included a $46 million net operating loss. (See Greiner Decl. ¶ 22; Best Decl. ¶ 38.)[24]  At a September 22, 2005 meeting, Best insisted that losses be reduced to $25 million. (See Second Mann Decl. ¶ 38.)  In response, Mann sent a letter in which he acknowledged that Boston Scientific's acquisition of Bionics was "propitious" for Bionics shareholders, and that Boston Scientific had "accepted the damage to Bionics caused by the [cochlear] recall with considerable grace . . . .  Until now you have agreed to all our plans for growth and our budgets, even though our funding needs have been much greater than expected and much more than you had initially committed." (See Letter of Alfred E.November 1, 2006 Mann to Lawrence Best, dated Oct. 3, 2005, attached as Ex. 12 to Second Mann Decl.)  Mann went on to outline "eight possible areas" of potential savings, each of which would have a negative impact on product development and potential revenue growth.  (See Second Mann Decl. ¶ 40.)  And, on November 8, Mann proposed an operating plan that projected operating losses of $36.5 million for 2006. (See id. ¶ 42.)

_____

Mann testified that Defendant did not approve of a joint venture relationship and wanted all products marketed through Boston Scientific, thus preventing Bionics from pursuing licensing arrangements with other companies. (See H. 101.)

[24] Mann testified that much of this loss was based on a speculative assessment of what the second recall would cost. (See H. 33.)

Defendant's view is that when asked to cut Bionics' losses, Mann refused.   (See Best Decl. ¶ 43.) Yet, despite Boston Scientific "emphatically warn[ing] both Mr. Mann and Mr. Greiner that Boston Scientific would not endlessly fund Bionics' losses" (see id. ¶ 44), the $36.5 million operating loss apparently was approved at an Executive Board meeting on February 17, 2006 (see Notes of Jeffrey Goldberg of Feb. 17, 2006 Executive Board Meeting, attached as Ex. 79A to Supplemental Declaration of Mark S. Germann in Support of Plaintiffs' Supplemental Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, dated Sept. 10, 2006).)[25]

Revenue and Profitability

Defendant expresses dissatisfaction with Bionics' bottom-line or profitability performance.   It contends that "Bionics has not come close to hitting its profitability targets under Mann and Greiner's leadership.  Although Bionics has somewhat exceeded its original revenue (and earn out) targets, it has fallen far short of the profitability forecast in the Bionics Plan in every single quarter, and has not come close to meeting its year-end targets." (Def.'s Mem. at 16.)

---

[25] Defendant rejects any suggestion that Boston Scientific has "approved" Bionics operating plans and financial results. "The fact that we took the operating plans they submitted and rolled them up into our corporate-wide financial statements suggests only that we took Mr. Mann and Mr. Greiner at their word when they said they would continue to lose more and more money." (Best Decl. ¶ 47.)

Plaintiffs maintain that the focus should be on top-line growth – pointing out that "despite a challenging market situation, Advanced Bionics has exceeded sales projections by approximately $12 million, translating to operating results beating plan by $10 million, and the company is expected to surpass the performance measures . . . for 2006 as a whole." (Pl.'s Mem. at 11; see also First Mann Decl. ¶ 21.) Plaintiffs contend that Bionics has achieved its quarterly top-line plan during five of the seven quarters, beginning in the fourth quarter of 2004, and "substantially achieved" its quarterly bottom-line plan during five of the seven quarters. (See Greiner Decl. ¶ 97.) Plaintiffs contend that Defendant purchased Bionics principally for its growth and that, on that front, the company has exceeded expectations. (See H. 154.) They also present evidence of several remarks made by Boston Scientific management to Wall Street analysts extolling Bionics' sales performance.[26]

* * *

The evidence about Bionics' quality control and financial

---

[26] See May 17, 2005 FD Wire transcript of Boston Scientific at Banc of America Securities Healthcare Conference, attached as Ex. 74 to Germann Decl.; Transcript of October 14, 2005 Boston Scientific Corporation Earnings Conference Call, attached as Ex. 75 to Germann Decl.; February 8, 2006 Form 425 SEC filing of the February 7, 2006 Transcripts of an analyst conference call, attached as Ex. 76 to Germann Decl.; June 27, 2006 FD Wire transcript of Boston Scientific Corporation at Jefferies & Co. Life Sciences Conference, attached as Ex. 77 to Germann Decl.; July 27, 2003 Thompson StreetEvents transcript of Boston Scientific's Q2 2006 Earnings Conference Call, attached as Ex. 78 to Germann Decl.

performance under Mann and Greiner is inconclusive.  There can be no doubt that these are issues about which Boston Scientific has a right to be concerned, and, by the time of the hearing, Boston Scientific's executives appear to have genuinely believed that these concerns merited Mann and Greiner's ouster.  Moreover, there is some evidence that Mann and Greiner's performance and responsiveness in these areas, particularly quality control, were in need of improvement.  Yet, viewing the record as a whole, including Defendant's statements to, and conduct toward, Mann and Greiner in 2005 and early 2006, it does not appear that Defendant viewed these issues as being nearly as problematic as they portrayed them at the hearing.

Plaintiffs introduced several exhibits indicating that while Defendant raised some concerns about quality and finances with Bionics management, it later gave the impression that the concerns had been addressed and, indeed, praised Mann and Greiner on their performance in those areas. (See e.g., E-mail from Jim Tobin to Jeff Greiner, dated May 7, 2005, attached as Ex. 34 to Greiner Decl. (offering "congratulations" to Bionics on the May FDA Form 483); E-mail from Paul LaViolette to Jeff Greiner, dated Dec. 21, 2005, attached as Ex. 3 to Greiner Decl. (stating "I want the Bionics team to spend the money wisely and as if it's their own. I believe that IS the case in almost all instances"); E-mail from Jim Tobin to Jeff Greiner, dated June 14, 2006, attached as Ex. 60 to Germann Decl. (stating "there is a lot positive happening on the

Quality side of the business . . . ."); E-mail from Jim Tobin to Dave Morley, dated June 13, 2006, attached as Ex. 45 to Germann Decl. (referring to a June 2006 tour of Bionics' facilities, "I was amazed by the amount of progress that had been made since the last time ....... I KNOW how much effort that takes, and I KNOW that it doesn't happen by accident ...."); Videotaped Advanced Bionics James Tobin and Alfred Mann Meeting of Aug. 24, 2006, attached as Ex. 8 to Declaration of William J. Sushon Concerning Video Excerpts Played at Preliminary Injunction Hearing, dated Oct. 18, 2006 (Tobin stated, in reference to the cochlear recall: "I never said one negative thing about that.").) In addition, LaViolette testified that other than ousting Mann and Greiner, Boston Scientific had no plans to change any of the rest of Bionics' management, and would allow Bionics to continue on a day-to-day basis as it had in the past. (See H. 333.) And, as both sides concede, quality was not even listed on Tobin's "Talking Points" as one of the deficiencies in Mann and Greiner's performance. Moreover, Neumann, the person selected to manage Bionics, conceded that he has no particular expertise in quality management. (See Neumann Dep., 19:8-25, 20.) Finally, that there were months of delay between the apparent decision to replace Mann and Greiner, and doing anything about it, other than offering the position to Neumann, evidences a lack of urgency.[27]

---

[27] An ancillary claim by Plaintiffs is that Defendant wanted to terminate Bionics' drug pump program and viewed terminating

The Court recognizes that words of encouragement do not necessarily signify satisfaction.  Moreover, Boston Scientific would not be the first employer to procrastinate in dealing with an unpleasant employee situation.  In the end, it is not the Court's role to weigh the relative merits of Boston Scientific's and the Earn Out Recipients' perceptions of whether Mann and Greiner are the best people to manage Bionics.  There is nothing in the Agreement that mandates that Mann and Greiner can be removed as co-CEOs only for "good cause"; nor does it impose on Boston Scientific the burden of proving good cause.  See Hartford Fire Ins. Co., 723 F. Supp. at 991 (the covenant of good faith and fair dealing cannot be used to supply additional terms to which the parties did not bargain).

Nevertheless, no matter how legitimate the reasons are for firing Mann and Greiner, they do not justify the means by which

---

Mann and Greiner as a necessary first step in doing so.  The drug pump is one of the four enumerated Earn Out products in the Merger Agreement, and, according to Plaintiffs, removing it will "depriv[e] the Earn Out Recipients of a substantial Earn Out Payment source. (See Pl.'s Mem. at 15.)  Defendant has dismissed Plaintiffs' claim as "bizarre and nonsensical," and stated that it has made "no decision about what Bionics should do with the drug pump." (See Def.'s Mem. at 23; Best Decl. ¶ 36 n 5.) Yet, the history of the parties' disagreement over the value of the drug pump program, and Defendant's current stance on its continued viability, leaves the Court in serious doubt about Defendant's claim that it has made no decision about the device's future.  Indeed, LaViolette's e-mail to Neumann on June 13, 2006 clearly stated that "[t]he drug pump will change" (see Ex. 9 to Germann Decl.), and, at the hearing, LaViolette confirmed that operationally Boston Scientific had no changes planned at Bionics except for the drug pump. (See H. 334-35.)

Boston Scientific has proceeded.   Defendant has improperly conflated the issue of <u>whether Mann and Greiner deserve</u> to be fired with the issue of <u>whether Defendant can terminate and replace them in the manner it has attempted</u>.   Defendant must proceed in good faith under the joint management structure of the Merger Agreement. The Executive Board has responsibility for the day-to-day operation of Bionics in order to protect the Earn Out Recipients' interests. While the Court recognizes that there were occasions when Boston Scientific management let Mann and Greiner know about its dissatisfaction with how certain issues were being handled,[28] there is no evidence that Boston Scientific's perception that there were critical problems at Bionics, which were attributable to Mann and Greiner's poor leadership, was raised and seriously discussed with the Executive Board.   Boston Scientific owed it to the Earn Out

---

[28] <u>See</u> Letter of Lawrence C. Best to Al Mann, dated Sept. 16, 2005, attached as Ex. DX10 to Best Decl.) (stating "we have been asking Bionics management how they intend to fund its operating deficit and the answer appears to be the pockets of Boston Scientific"); Executive Board Presentation, dated Sept. 22, 2005, attached as Ex. DX11 to Best Decl.) (noting substantial financial losses for 2005); Letter of Lawrence J. Knopf to Al Mann, dated Nov. 7, 2005, attached as Ex. DX14 to Best Decl.) (stating that "[w]e have greatly exceeded our contractual commitment and expect to absorb additional losses through year-end"); E-mail of Jeff Greiner to Jim Tobin, dated May 4, 2006, Ex. DXAA22 (stating "I take personally the four recalls we've had in the past 20 months . . . . That means we are changing the way we do business at Advanced Bionics . . . ."); Memorandum from Todd Whitehurst to John Oakes and Jeff Goldberg, dated May 17, 2006, DX51 (noting a "culture of fear . . . is one of the primary root causes of [Bionics] current quality and reliability crisis"; Confidential Memorandum from Al Mann to Larry Best, dated May 12, 2006, attached as Ex. DX5 to Best Decl.) (responding to Best's outspoken criticism of Bionics' financial losses).

Recipients, via the Executive Board, to be forthright in raising and seeking a remedy for perceived, legitimate operational and management deficiencies.  This did not occur.

III. Irreparable Injury

To establish irreparable harm, the moving party must demonstrate "an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005) (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)).  Plaintiffs initially proffer that the parties' Merger Agreement stipulates that any deviation from the procedures outlined in the contract creates a presumption of irreparable damage deserving of great weight. (See Merger Agreement § 8.08;[29] Pl.'s Mem. at 17 (quoting Alpha Capital Aktiengesellschaft v. Advanced Viral Research Corp., Nos. 02 Civ. 10237 (GBD), 03 Civ. 00009, 03 Civ. 00512, 2003 WL 328302, *5-6 (S.D.N.Y. Feb. 11, 2003).)  They contend that "unless Boston Scientific can overcome the 'great weight' Section 8.08 merits, it cannot defeat Plaintiffs' irreparable harm showing." (Pl.'s Mem. at 18.) Moreover, whether or not the Court gives any particular weight

---

[29] The Agreement provides:
Irreparable damage would occur in the event any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy at law or equity.

to Section 8.08, Plaintiffs contend that they will be irreparably harmed because removal and replacement of Mann and Greiner in the manner planned by Defendant will result in loss of their joint control rights. Indeed, the focal point of this litigation is the Bionics' CEO seat. The CEO, from the viewpoint of Plaintiffs, serves not only to manage the day-to-day operations of Bionics, but is required to do so in a manner that recognizes and respects the interests of the Earn Out Recipients. Allowing Defendant to go forward with its plan, Plaintiffs argue, harms them in two ways. First, as discussed <u>supra</u>, the scheme would apparently dilute the importance of the Executive Board by making the new chief executive primarily answerable to Boston Scientific. Second, appointment of a new chief executive, without the input of Mann, would cause Plaintiffs to lose their primary advocate on business strategy and operations, <u>and</u> the only mechanism with which to challenge Tobin's "final say" at the end of the dispute resolution procedure.[30] (<u>See</u> Pl.'s Supp. Mem. at 18.) This, they argue, will indubitably result in the nullification of all joint control provisions in the Agreement. <u>Id.</u> Plaintiffs urge that losing "a voice in Advanced

---

[30] The basis for this claim is the dispute resolution process outlined in Section 5.04(g)(I). This process assumes that the Earn Out Recipients will be represented by the CEO in any dispute with Boston Scientific. Also, the penultimate stage of the process – referral of a disputed matter to an independent board – must be initiated by the Bionics CEO. Plaintiffs contend that if the Bionics CEO is beholden to Boston Scientific, they will not have an effective advocate on contested issues with Boston Scientific, nor a representative willing to escalate matters to the independent committee stage.

Bionics' management [] cannot be compensated by money damages."
(Pl.'s Mem. at 19.)

In Wisdom Import Sales Co., LLC v. Labatt Brewing Co. Ltd.,
339 F.3d 101 (2003), the Second Circuit recognized that loss of
"bargained-for minority rights" may constitute irreparable harm
where those rights "are central to preserving an agreed-upon
balance of power in corporate management." (Id. at 114.)   Other
courts in this Circuit have similarly recognized that the loss of
a bargained-for "voice" in the management of a company can
constitute irreparable harm. See Int'l Equity Investments, Inc. v.
Opportunity Equity Partners Ltd., 441 F. Supp. 2d 552, 563
(S.D.N.Y. 2006) ("[c]onduct that unnecessarily frustrates efforts
to obtain or preserve the right to participate in the management of
a company may constitute irreparable harm") (internal quotes and
citations omitted); Global Switching, Inc. v. Kasper, No. CV-06-
0412 (CPS), 2006 WL 385315, at *3 (E.D.N.Y. Feb. 17, 2006) (holding
that plaintiffs suffered irreparable harm where they had lost a
"measure of control" over their business"); Suchodolski Assoc.,
Inc. V. Cardell Fin. Corp., No. 03 Civ. 4148 (WHP), 2003 WL
22909149, at *4 (S.D.N.Y. Dec. 10, 2003) (noting that the dilution
of a party's stake in, or a party's loss of control of, a business
constitutes irreparable harm); Davis v. Rondina, 741 F. Supp. 1115,
1125 (S.D.N.Y. 1990) (holding that damages could not compensate
plaintiff for "loss of the opportunity to continue to manage the
company which she has helped to build and for which she has

guaranteed substantial loans"); <u>Street v. Vitti</u>, 685 F. Supp. 379, 384 (S.D.N.Y. 1988) (enjoining a majority shareholder from terminating the employment of plaintiffs, minority shareholders, or taking actions to dilute their shareholdings, after determining that allowing defendant to fire the plaintiffs would divest them of certain corporate management prerogatives, such as inspecting the books).[31]

Defendant first responds that Plaintiffs will not lose any of their bargained-for control because they will retain three seats on the Executive Board and their "rights to shared corporate management over the company." (<u>See</u> Defendant Boston Scientific Corporation's Post-Hearing Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, dated Oct. 20, 2006, at 16.) Defendant further contends that Plaintiffs' remedy, if any, lies in the contract; Section 5.05(g)(ii) allows Plaintiffs to sue if they believe that a decision they have opposed has resulted in a loss of the payout to which they are entitled. (<u>See</u> Def.'s Mem. at 27-28.)

As discussed, the Court is convinced that Defendant's plan to unilaterally appoint a new CEO for Bionics would, at best, severely impair, and, at worst, strip Plaintiffs of their joint control rights.  Joint management during the earn out period is one of the

---

[31] The Court is mindful that unlike the corporate relationships in the cases cited, Bionics is a wholly-owned subsidiary of Defendant.  However, as both parties have conceded, they have agreed to a most unusual corporate arrangement.  And, as discussed, Defendant does not enjoy the full breadth of control that it ordinarily would over a subsidiary.

fundamental principles of the Merger Agreement.  Defendant's contention that there is no significance to be ascribed to who terminates the services of Mann and Greiner, how they are terminated, and who appoints the new CEO, because the Executive Board will remain intact, is myopic.  Who manages the day-to-day operation of Bionics, and the authority and process by which they hold their positions or lose it, is highly relevant to protecting the rights of the Earn Out Recipients.

Additionally, the Court does not find persuasive Defendant's argument that any of Plaintiffs' grievances can be later addressed with money damages under Section 5.04(g)(ii).  Defendant is correct that courts must be wary of granting injunctive relief where injuries can later be quantified and compensated. See Merit Capital Group, LLC v. Trio Indust. Mgmt., LLC, No. 04 Civ. 7690 (RCC), 2005 WL 53283, at *2 (S.D.N.Y. Jan. 10, 2005) (citing Wisdom Import, 339 F.3d at 114, for "the essential distinction between compensable and non-compensable harm).  However, it is dubious that a court could quantify the damage done by Plaintiffs' loss of its share in managing Bionics.  Moreover, Defendant's argument presumes that the bargained-for joint management authority has no intrinsic value.  Had Plaintiffs wished to contract only to receive a certain sum of money, that would have been clear from the Agreement.  Instead, they negotiated the right to run the company in conjunction with Defendant.  That was part of the deal.

Thus, it is clear that Plaintiffs will suffer irreparable

injury if Boston Scientific is free to replace Mann and Greiner with the CEO of its choosing.  The Agreement does not permit this.  Moreover, requiring Mann and Tobin to agree on a successor CEO is essentially the only means of imposing some check on Boston Scientific's ability to coopt control over Bionics, which is prohibited by the Agreement.  If Boston Scientific can unilaterally remove and replace the CEO, even though the CEO would still report to the Executive Board he would have little incentive to vigorously advocate proposals to the Board that Boston Scientific opposed, and is likely to be extremely wary of invoking the impartial mediation process.  In effect, there would no longer be meaningful joint management of Bionics by the Earn Out Recipients and Boston Scientific.

Enjoining the removal of Mann and Greiner, however, is another point.  The Court has concluded that Boston Scientific approached the removal in bad faith, failing to engage in the joint management process through the Executive Board.  Nevertheless, the genie cannot be put back into the bottle.  It would be a rather hollow exercise to require Tobin, LaViolette, and Best to return to the Executive Board (on which Mann and Greiner sit), explain their dissatisfaction with Mann and Greiner, and reconsider their position.  The Court has no doubt that the hearing in this case provided the parties with as full an airing of each side's perceptions as there can be.

There do, however, remain several steps in the mediation

process which have not yet been exhausted and, if the process called for in the Agreement is to have any meaning now or in the future, the parties must complete the process.  There remains the possibility, however slim, that the impartial mediation board will propose a solution acceptable to both sides.  On the other hand, one or both of the parties may reject the board's recommendation, in which case it is undisputed that Tobin has the final say.  And that is the way it should be.

The parties themselves recognized in the Agreement that, with the only exception being the choice of a successor CEO for Bionics, Tobin, as the CEO of the publicly held parent company, has ultimate responsibility for what occurs at Bionics.  That responsibility cannot be ceded to, or usurped by, anyone else, including this Court.  Boston Scientific has the right, explicitly recognized in the Agreement, to ensure that Bionics complies with Boston Scientific's policies and procedures.  It follows that Tobin and his executive staff have the right to expect that the management of Bionics cooperate with them in implementing Boston Scientific's policies and procedures.

The Court is unable to conclude that the Earn Out Recipients will suffer irreparable harm should Tobin determine at the end of the process that Mann and Greiner should be terminated.  No one disputes that Mann and Greiner are responsible for making Bionics what it is today.  They established and built the company into a potential multi-billion dollar enterprise.  Mann is universally

recognized as a brilliant innovator who has founded numerous companies which have invented and patented many breakthrough medical devices, and he has become an extremely wealthy man who now devotes much of his time and wealth to philanthropic causes.

Nevertheless, Mann, Greiner and the other Earn Out Recipients agreed to sell Bionics to Boston Scientific. While it is true that much of the consideration remains to be paid, which is why they retain the right to joint management, that management is not personal to Mann and Greiner. As discussed, the Agreement clearly contemplates that they can be replaced. It is not their removal that will cause the Earn Out Recipients irreparable injury; rather, it would be the loss of joint management that would do so. The Earn Out Recipients, however, will retain that right as the result of three concrete safeguards in the Agreement: (1) the Executive Board, consisting of three Bionics representatives and  three Boston Scientific representatives, remains responsible for the overall operation and strategy of Bionics; (2) Boston Scientific needs to secure Mann's agreement to any successor CEO of Bionics; and (3) the CEO continues to report to the Executive Board, not to Boston Scientific. Finally, should the Earn Out Recipients conclude that Mann and Greiner's removal injured their ability to maximize the payout under the Agreement, which, after all, is their ultimate interest, Section 5.05(g)(ii) of the Agreement provides a potential remedy through a judicial proceeding.

**CONCLUSION**

For the reasons set forth above, the Court concludes that Plaintiffs have demonstrated a likelihood of success on the merits of their claims of express and implied breaches of the Merger Agreement, and that they will suffer irreparable injury if certain of the breaches are not enjoined.  Thus, the Court recommends the issuance of a preliminary injunction enjoining Defendant from dismissing Mann and Greiner unless and until the parties complete the dispute resolution process set forth in the Agreement, in good faith.  Should Mann and Greiner ultimately be terminated, Defendant should be enjoined from selecting a replacement unless mutually agreed upon by Mann and Tobin, or his successor.

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. <u>See also</u> Fed. R. Civ. P. 6(a), (e).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Alvin K. Hellerstein, United States District Judge, and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Hellerstein.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); <u>Mario v. P & C Food Mkts., Inc.</u>, 313 F.3d 758, 766 (2d Cir. 2002); <u>Spence v. Superintendent</u>, 219 F.3d 162, 174 (2d Cir. 2000); <u>Small v. Sec'y</u>

of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per
curiam).

Respectfully Submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: November 1, 2006
       New York, New York