UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
CARLA WOODS and JEFFERY GOLDBERG, as     :
Stockholders' Representative and Trustees of the   :   **OPINION AND ORDER**
Bionics Trust,                                     :   **ACCEPTING REPORT**
                     Plaintiff,                :   **AND**
                                                   :   **RECOMMENDATION,**
    -against-                                    :   **WITH MODIFICATION**
                                                   :
BOSTON SCIENTIFIC CORPORATION,                     :   06 Civ. 5380 (AKH)
                                                   :
                     Defendant.                 :
--------------------------------------------------------------- x
ALVIN K. HELLERSTEIN, U.S.D.J.:

        This case arises from covenants given by Boston Scientific Corporation ("Boston Scientific") to Advanced Bionics Corporation ("Bionics"), a private corporation that Boston Scientific acquired as of May 28, 2004, and to its owners. The covenants, expressed in a written agreement and plan of merger, were the subjects of specific bargaining between the parties, and Boston Scientific's willingness to agree to those covenants persuaded the owners of Bionics to choose Boston Scientific over other suitors. The covenants provided, generally, that Bionics would continue to be operated separately and independently under a separate budget, that Bionics's management would remain in place, and that a portion of the compensation payable to Bionics's owners opting not to be paid entirely at the outset would be paid at stated periods, between January 1, 2005 and December 1, 2013, based on aggregate net sales of specific drug pump and auditory products, in excess of defined thresholds and defined gross margins. The agreement provided that overall management of the Bionics operations would be exercised by a six-person Executive Board of whom three were to be appointed by Boston Scientific and three by Bionics, and that the executives of Bionics were to report to that Executive Board, rather than to the Boston Scientific Board of Directors. The Chief Executive Officer and the Chief Financial

1

Officer who had led Bionics were to remain in their positions, continuing to be responsible for the day-to-day management of Bionics, exercising their full functions until their successors were duly elected or appointed and qualified, or until their earlier death, resignation, or removal. Agreement, § 2.05.

These detailed, post-merger management provisions for the continuing management of Bionics were to be paramount over Boston Scientific's regular practices, policies, and procedures. See Agreement, § 5.04(a). The Bionics business was to be managed by the jointly-appointed Executive Board, rather than by Boston Scientific's board of directors, until December 31, 2013, through the period of pay-out to Bionics's former owners. Agreement, § 5.04(b). No action could be taken by the Executive Board unless a quorum of four of the six members was present and all voted for the indicated action—that is, by consensus of both the Boston Scientific and the Bionics representatives. Agreement, § 5.04(c). To the extent that these provisions of governance were to conflict with Boston Scientific's normal rules of governance, Boston Scientific waived its right to challenge the Agreement on that basis. See Agreement, §§ 5.04(j), 8.09.

Section 5.04 also regulated how officers of Bionics could be terminated or given good reason to leave Bionics. As with other decisions bearing on strategic direction, see Agreement, § 5.04(d), decisions respecting termination were first to be referred to the Executive Board. In the event that the Executive Board could not reach agreement on such matter, the matter was to be resolved by the chief executive officers of both companies, James Tobin and Alfred E. Mann, respectively. If they could not agree, Mr. Tobin was to decide the issue, but if Mr. Mann remained opposed to Mr. Tobin's decision, Mann could within fifteen days refer the dispute to an independent committee of three business people experienced in the medical device

business selected jointly by Mann and Tobin. Agreement, § 5.04(g)(i). The independent committee was to be given thirty days to resolve the dispute. Any resolution proposed by the independent committee was to be nonbinding, though the Agreement contemplated litigation, if Tobin were to decide a matter over the objection of the Executive Board and Mr. Mann (or his successor). Agreement, § 5.04(g)(ii).

Section 5.04(g)(iii) provided specifically for joint appointments of successors to Mr. Mann and Mr. Greiner as Bionics's existing co-chief executive officers if either ceased to be co-chief executive officer. Successors could not be appointed except by consensus; the agreement required joint action of Mr. Tobin and Mr. Mann, or Mr. Tobin and Mr. Greiner, respectively. If Mann was absent or incapacitated, Mr. Greiner (or his successor) was to function with Tobin. If both Messrs. Greiner and Mann were incapacitated or absent, Mr. Tobin (or his successor) had the right of unilateral appointment of successors to Mann and Greiner, subject to the right of the Stockholders' Representative of Bionics to refer the matter to the independent committee for nonbinding resolution in accordance with § 5.04(g)(i) of the Agreement.

Boston Scientific is a large public corporation engaged in the development and marketing of medical devices. Taking the position that its own corporate policies and needs required a change in the operating management of its Bionics division, in order, ostensibly, to adjust production of the medical devices providing the base for earn-out payments to Bionics's owners, Boston Scientific made demand on Mann and Greiner that they resign. They refused. Boston Scientific, through subordinate officers whom Boston Scientific had designated, then demanded a meeting of Bionics's Executive Board, to terminate Mann and Greiner as Bionics's co-chief executive officers.

Plaintiffs, as the representatives and trustees of the Bionics Trust, the holder of the interests of the Bionics owners, brought suit, contending that Boston Scientific breached its covenants to the Bionics owners, and moved for a preliminary injunction to prevent the termination of Mann and Greiner.  The District Judge then presiding over the case referred the matter to United States Magistrate Judge Theodore H. Katz, who held three days of evidentiary hearings and issued a thoroughly detailed Report and Recommendation.  His Report and Recommendation found that Boston Scientific breached the covenants of the Boston Scientific/Bionics agreement, as well as the implied covenant of good faith and fair dealing under New York law, and recommended that a preliminary injunction issue requiring Boston Scientific to follow the procedures established by its agreement with Bionics, and enjoining Boston Scientific from terminating the two Bionics chief executive officers before exhausting those procedures.  However, Judge Katz excused Boston Scientific from pursuing the first of the procedures, which required Tobin to discuss Boston Scientific's intended move with the jointly-composed Executive Board.  Judge Katz ruled that the extensive charges and proofs during the three days of hearings that he conducted were the equivalent of such personal meetings.  I disagree with that ruling, but agree with the balance of Judge Katz's Report and Recommendation.

During the course of this case, responsibility was transferred to me, and Judge Katz issued his Report and Recommendation to me.  I have given the case de novo review, as I am required to do in light of the parties' objections.  See 28 U.S.C. § 636(b)(1).  I have reviewed the record, studied the Report and Recommendation, and considered the parties' objections and additional submissions.

I adopt Judge Katz's Report and Recommendation.  His findings of fact, based on the agreements between Boston Scientific, Bionics, and Bionics's owners, and the evidentiary history of the negotiations among them, are thorough and accurate, and I adopt them as my own.  I agree also with his conclusions of law, and I adopt them as my own as well.  All the criteria for issuing a preliminary injunction are satisfied.

Boston Scientific objects, arguing that it has the powers and responsibilities of governance of its corporate structure, and that it can act in the best interests of the corporation, as it determines those best interests.  It contends that Mann and Greiner are at-will employees, whom it can terminate with or without cause.  Magistrate Judge Katz's findings and conclusions of law reject those objections and, for the reasons he stated, and as I elaborate here, I adopt those findings and conclusions.  I elaborate on a few more points below.

Although the Agreement itself is governed by New York law, Agreement, § 8.09, Boston Scientific is a Delaware corporation, and its powers, including its power to contract, are governed by Delaware law.  See Sturman v. Singer, 213 A.D.2d 324, 325 (N.Y. App. Div. 1995); c.f., Richbell Info. Servs., Inc. v. Jupiter Partners, L.P., 309 A.D.2d 288, 301 (N.Y. App. Div. 2003).  Generally, Delaware law, like New York law, prohibits agreements that "have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters," Abercrombie v. Davies, 123 A.2d 893, 899 (Del. Ch. 1956) (directors agreement to vote unanimously or submit to outside arbitrator illegal) (rev'd on other grounds); see also Chapin v. Benwood Foundation., Inc, 402 A.2d 1205, 1211 (Del. Ch. 1979) (quoting Abercrombie) (commitment of current board and sole members of corporation to fill vacancy with specified individual).  The trend, however, has been to recognize that "business decisions are not an abdication of directorial authority merely because they limit a board's freedom of

5

future action." Grimes v. Donald, 673 A.2d 1207, 1214-15 (Del. 1996) (upholding validity of employment agreement with large severance provision) (overruled in part on other grounds by Brehm v. Eisner, 746 A.2d 244 (Del.2000)).

In this case, Boston Scientific considered it imperative to add Bionics's proprietary products to augment its own line. Boston Scientific negotiated that its cost of acquisition would be made up largely with cash flow generated by the Bionics products it was acquiring. The only way Boston Scientific could achieve its objective was to provide Bionics with an independent operation, to assure its owners that payments would be made to them over time, using Bionics's revenues as the source of the cash flow that Boston Scientific needed to make its payments. Boston Scientific did not abdicate authority, but instead exercised its business judgment. Cf. Rosenblatt v. Getty Oil Co., 493 A.2d 929, 943-44 (Del. 1985) (upholding delegation of valuation responsibility to independent appraiser as part of merger agreement and holding "informed decision to delegate a task is as much an exercise of business judgment as any other"). The law of New York is not to the contrary. See In re Paramount Publix Corp., 90 F.2d 441 (2d Cir. 1937) (corporation bound as party to employment contract); Reiss v. Usona Shirt Co., 159 N.Y.S. 1031 (N.Y. App. Div. 1916) (conflict with bylaws not a bar to enforceability of fixed-term employment contract); see also 6 William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 2579 (perm. ed., rev. vol. 2005).

The trend of cases is to recognize the importance of agreements to regulate control in the context of closely-held corporations. See Zion v. Kurtz, 50 N.Y.2d 92,102 (N.Y. 1980) (applying Delaware law to enforce shareholder agreement to withhold board action absent consent of minority shareholder); Clark v. Dodge, 269 N.Y. 410 (1936) (general fiduciary law does not provide basis for evading contractual obligations respecting employment); Adler v.

6

Svingos, 436 N.Y.S.2d 719, 721 (N.Y. App. Div. 1981) (enforcing consensus requirement for corporate action).  Although Boston Scientific is not itself a closely-held corporation, its agreement with Bionics to maintain the integrity of Bionics's operation had the effect of creating a hybrid form of operation—somewhere between a partnership or joint venture, and a subsidiary. The governance devised by the parties for their form of operation—a necessity in order to make the deal—is as reasonable and enforceable as an agreement among shareholders in a closely-held corporation. See Agreement, § 5.04(j) (waiver of objection of impermissible delegation).  Boston Scientific had a choice: give up the acquisition and maintain full powers to hire and fire whom it wished; or make the acquisition under an agreement that limited and curtailed those powers and subjected them to the provisions of § 5.04 of the agreement.  It chose the latter, and its choice is binding.

Boston Scientific specifically agreed that the rights and obligations defined in its agreement with Bionics and its owners would prevail over general corporate principles and laws of governance, and it agreed to waive any defenses to the Agreement on the basis of such principles.  Agreement, § 5.04 (a),(j).  Boston Scientific, having agreed that Mann and Greiner should continue to be co-chief executive officers of Bionics, and that they should report and be subject only to a jointly-appointed, six-person, special Executive Board, gave up the unilateral right to  bypass the Executive Board and the independent committee in firing them, and the right to appoint successors without Mann's approval.  The Boston Scientific/Bionics Agreement and Plan of Merger clearly so provides.  And it was Boston Scientific's obligation, if it wanted to change the product mix that caused it to acquire Bionics and which constitutes the base for continuing payments to Bionics's former owners, to discuss the matter with Bionics's executive officers and the Executive Board, and to agree upon a mutually agreeable substitute.  By

7

agreement, Boston Scientific gave up the right to conduct the Bionics segments of its business as it, alone, wished. Through 2013, while the earn-out period was scheduled to last, it married itself to Bionics's management and owners' representative.

I adopt Judge Katz's holding that Boston Scientific breached the agreement with Bionics and acted in bad faith in trying to circumvent these provisions. The agreement does not allow Boston Scientific unilaterally to terminate Mann and Greiner as Bionics's co-chief executive officers, or even to present a termination as a fait accompli to Mann and Greiner. Tobin, if he wished to conform to the agreement, should have discussed his proposal for executive changes with the Executive Board in good faith, personally and not through subordinates, with the perspective of looking for a mutually agreed solution to whatever issues of grievance Tobin wished to raise. If Tobin could not, after good faith discussion, persuade the Executive Board to terminate Mann and Greiner, or failing such compromise, Tobin could not convince Mann himself to accede to his removal, Tobin had the right to appoint successors, but Mann then had the right to require an independent committee to be convened, to come to its own independent resolution of the issues separating the two men. Meanwhile, and until successors were appointed, Mann and Greiner were to remain in office, and Boston Scientific could not abrogate that status by unilateral fiat. It could not appoint an executive officer for Bionics "other than those appointed pursuant to [the Executive Board and independent committee provisions of] Section 504(g)." Agreement, § 5.04(e)(iv). I agree with Judge Katz that Boston Scientific failed to follow the covenants provided by the Boston Scientific/Bionics Agreement, and I reject Boston Scientific's objections to the contrary. I agree also with Judge Katz that money damages is not an adequate remedy at law, and that plaintiffs will be irreparably damaged by defendant's conduct. Agreement, § 8.08.

Boston Scientific claims that it had three good reasons to terminate Mann and Greiner: "weak management performance, including inadequate attention to product quality; unacceptable financial results; and hiding issues of serious concern from BSC." Judge Katz's opinion discusses these issues thoroughly, and I agree with his findings and conclusions. He notes, correctly, that the issue before the Court is not what might have motivated Boston Scientific, or whether Greiner and Mann deserved to be fired, but whether or not Boston Scientific, in good faith, discussed whatever concerns it might have had about Mann and Greiner's leadership with the Executive Board, and with Mann and Greiner, as the Boston Scientific/Bionics agreement required. Boston Scientific gave up the right to fire Mann and Greiner summarily and without resort to the procedures established in the Agreement, and hence its argument that it had "the right, if not a duty to its shareholders, to fire leaders who produce 'inconclusive' results," must fail; the board's general duty of care does not excuse the corporation from its contractual obligations in this case. See In re Paramount Publix Corp., 90 F.2d at 444-45; (corporation bound as party to employment contract); 6 William Meade Fletcher, et al., Fletcher Cyclopedia of the Law of Private Corporations § 2579 (perm. ed., rev. vol. 2005). Under the agreement, Boston Scientific accepted the obligation to discuss its criticisms with Mann and Greiner, to agree on mutually acceptable correctives and, if discussions failed, to proceed through the disputes resolutions procedure provided by the agreement. I adopt Judge Katz' findings that it was Boston Scientific, and not Bionics, that failed to act as the agreement required.

Judge Katz recommended that preliminary injunctive relief be granted, preliminarily enjoining Boston Scientific from dismissing Mann and Greiner. I agree. And Boston Scientific must begin the process, if it wishes to pursue such a dismissal, in the manner

9

set forth in the Agreement, § 5.04(e)(v).  James Tobin must submit the matter for review to the Executive Board, and failing consensus, must discuss the matter personally with Mann, as § 5.04(g)(i) of the agreement requires.  I disagree with Judge Katz that these initial steps can be excused because all the points have been the subjects of proof in the lawsuit.  If the parties agree to discuss, they must be held to their agreement unless both sides waive, and there has been no waiver.  Opinions can be influenced and consensus can be reached through in-person meeting and debate. Corporate law requires that a board of directors must act through meetings of its directors, and not simply collect their opinions, unless the charter or by-laws of a company provide differently. Del.Code. Ann. Tit. 8 § 141 (b)(f); N.Y. Bus. Corp. Law § 708(a)-(b); Douglas Dev. Corp. v. Carillo, 64 N.Y.S.2d 747 (N.Y. Sup. Ct. 1946) (citing Hauben v. Morris, 291 N.Y.S. 96 (N.Y. Sup. Ct. 1936) (procedures for formal board action cannot be bypassed). Similarly, agreements to mediate before suing are enforced, even if one party or the other contends that its mind is fixed.  See AMF, Inc. v. Brunswick Corp., 621 F.Supp 456, 461-62 (E.D.N.Y. 1985).  And requirements to bargain before striking or locking out in labor management disputes are upheld even if the parties are adamant in their positions.  See N. L. R. B. v. Gen. Elec. Co., 418 F.2d 736, 762-63 (2d Cir. 1969).  In this case too, every step in the process of discussion, conciliation, mediation and arbitration is important, in accordance with the provisions of the Merger Agreement so providing.

      Plaintiff will settle a proposed preliminary injunction on five days' notice.  The parties, if they cannot agree to particular terms, will submit a single instrument, marked to show their contrasting positions, and submit a single joint letter presenting their respective positions pursuant to my Individual Rules, 2E.

Judge Katz' findings suggest that there may be few, if any, further facts to try, incident to the final determination of the case. The parties shall confer with respect to this issue, and if either party contends that material triable issues remain, that party shall explain what they are and the reasons why it believes such issues are good faith disputes about the material facts, with opposition comments to be submitted at the same time in a joint letter (Individual Rule 2E). The joint submission is due by February 21, 2007.

    SO ORDERED.

Dated:    New York, New York
             January 31, 2007

                                                ALVIN K. HELLERSTEIN
                                                United States District Judge